**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert James HELLER,**
**Defendant-Appellant.**

No. 79–5534.

United States Court of Appeals,
Fifth Circuit.

Sept. 8, 1980.

Rehearing Denied Oct. 16, 1980.

Thomas F. Almon (Court-appointed) Miami, Fla., for defendant-appellant.

Mervyn Hamburg, Atty., App. Section, Criminal Division, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before KRAVITCH, HENDERSON and REAVLEY, Circuit Judges.

KRAVITCH, Circuit Judge.

Robert James Heller, appellant, was convicted by a jury of conspiracy to pass, utter and publish 121 counterfeit $100,000 United States treasury bills.[1] The jury acquitted him of the substantive offense of attempting to pass the counterfeit bills.[2] On appeal, he alleges: (1) there was insufficient evidence to support the verdict; (2) certain evidence was improperly admitted; (3) the British officers who arrested him failed to comply with the fourth amendment and the *Miranda* rule; and (4) the prosecutor improperly remarked to the jury on his failure to testify. For the reasons stated below, we affirm.

*Background*

On October 24, 1975, appellant was arrested at an airport in London, England by British officials acting on a tip supplied by an American Secret Service agent. On his person were 121 counterfeit $100,000 United States treasury bills. The government alleged that appellant was part of a conspiracy to negotiate the counterfeit bills in Europe. Appellant claims he did not know the bills were counterfeit.

An elaborate scheme to defraud on an international scale was conceived in May of 1975 by Keats, a California fugitive, and one Cagnina. In essence the plan was to steal securities by substituting counterfeit ones for genuine securities contained in portfolios. Keats recruited Heller to negotiate the securities to be stolen. For that purpose Keats met with appellant in June of 1975 and explained the plan to obtain securities by substituting counterfeit ones, hopefully within two or three months. Appellant agreed to the plan and to explore the possibility of negotiating the stolen securities in Europe.

In July Keats and appellant met in Italy. Appellant informed Keats that several parties were interested in the securities, but because Keats as yet had no specific information concerning the nature of the securities, no transaction could be made definite. The two agreed to meet again in Miami in August or September.

In September, Keats met with appellant in Miami and outlined a cover story to be used to explain to prospective purchasers the reason for selling the securities. Appellant ostensibly would be the banking representative of a corporation seeking borrowed funds to purchase from the Golf Oil Corporation its interest in the planned community of Reston, Virginia. Later in September,

---

1. Count I of the indictment stated in part:

1. From on or about May 30, 1975, and continuing thereafter up to on or about October 25, in the Southern District of Florida and elsewhere:

ROBERT JAMES HELLER

the defendant herein, did knowingly, willfully and unlawfully combine, conspire, confederate and agree with divers other persons known and unknown to the Grand Jury to commit offenses against the United States to wit: to violate Sections 471, 472, and 473 of Title 18, United States Code, that is, to willfully and knowingly with intent to defraud the United States to transport, receive, sell, possess and deliver, pass, utter and publish as true and genuine, 121 counterfeit $100,000 United States Treasury Bills, representing a face amount value of approximately $12 million, knowing the same to be counterfeit.

2. Count II of the indictment stated:

During the period October 1975, in London, England and Switzerland the defendant ROBERT JAMES HELLER with intent to defraud, did wilfully and knowingly cause the attempt to pass, utter, publish and possess counterfeit obligations of the United States, that is, 121 counterfeit $100,000 United States Treasury Bills front plate #D 1966–D, back plate #6 Quadrant "D", Cusip: 912793YC4, issue date 6/19/75, maturity date 12/18/75 and bearing serial numbers:

417321B through 417359B
419436B through 419465B
532418B through 532454B
533007B through 533030B

and the defendant then knew the said notes to be forged and counterfeit. This said offense beginning in the Southern District of Florida.

All in violation of Sections 472 and 2, Title 18, United States Code and Sections 3237, 3238 of Title 18, United States Code.

Keats once more met with appellant and provided him with documents concerning the purported transaction.[3] At this meeting Keats told appellant that the attorney who was to front the Reston transaction would have to be killed because he was the only person who could tie them to the scheme. Appellant reluctantly agreed, although he and Keats decided to search for some way to avoid a murder.

Also in September, Cagnina and Keats determined that the securities to be used in the scheme would be United States treasury bills of $100,000 denomination, and Keats relayed this information to appellant. A printer in New York was employed to print the counterfeit treasury bills, but the printing took longer than the parties anticipated. When Keats informed appellant of the delay, appellant responded that time was of the essence and the printing should be speeded up. Prior to the completion of the printing, Keats furnished appellant with the serial numbers of the treasury bills.

During the month, Cagnina made unsuccessful attempts to find securities for which the counterfeits could be substituted. In late September, Keats and Cagnina abandoned the original plan of substituting counterfeit securities for real ones, deciding instead to negotiate the counterfeit treasury bills directly. There is no evidence that appellant was advised of this change in plans.

Appellant went to Europe to arrange the negotiation of the treasury bills and on October 12, Keats, after receiving the counterfeit bills from Cagnina, delivered them to appellant in London. Appellant then traveled to various places in Europe attempting to negotiate the bills. On October 23, a United States Secret Service agent, relying on an informant's tip, advised New Scotland Yard that appellant was in London and in possession of counterfeit treasury bills. On October 24, appellant was

detained by British authorities at the airport. The counterfeit bills were discovered in his attache case and he was arrested.

*Sufficiency of the Evidence*

Appellant contends there was insufficient evidence to support his conviction. Essentially he argues that the only contested issue at trial was whether he knew the treasury bills were counterfeit, and that issue was determined in his favor by virtue of the not guilty verdict on the substantive offense. Appellant concludes, therefore, no evidence remains to support his conviction of conspiracy to pass, utter, and publish those counterfeit bills.

It is a settled principle that a jury is free to render inconsistent or compromise verdicts. *United States v. Michel*, 588 F.2d 986 (5th Cir. 1979), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1980); *United States v. Fuiman*, 546 F.2d 1155 (5th Cir.), *cert. denied*, 434 U.S. 856, 98 S.Ct. 176, 54 L.Ed.2d 127 (1977). The conspiracy conviction is not invalid simply because the jury acquitted appellant of the substantive offense. On the other hand, in another case in which the defendant was convicted of conspiracy but acquitted of the substantive offense, we stated: "Such a result should engage our judicial skepticism. A critical examination of the facts is required when such a contrariety of results does appear." *United States v. Caro*, 569 F.2d 411, 418 (5th Cir. 1978).

█ Our examination of the record convinces us that the jury could have found beyond a reasonable doubt that appellant conspired to pass, utter, and publish counterfeit treasury bills, even if he was not aware that the bills in his possession were counterfeit. There is ample evidence that appellant agreed with Keats and others to participate in the original scheme to dispose of stolen securities, a scheme that entailed the substitution of counterfeit securities for

---

**3.** Documents were drawn up purporting to create a corporation, named U.S.G., Inc., and authorizing appellant to act as banking representative for the corporation. Keats also provided appellant with blank stationery from a bank in New York so that the treasury bills would ap-

pear to have been passed from that bank to a bank owned by appellant in St. Vincent. This was done in order to reflect transfer of the treasury bills on a bank-to-bank basis without any handling by private individuals.

genuine ones, and, as the intrigue progressed, understood that the securities to be utilized in the ruse would be U. S. treasury bills of $100,000 denomination. We conclude that such a use of counterfeit treasury bills would have constituted passing and uttering with intent to defraud. Black's Law Dictionary defines "utter" as: "To put or send . . . into circulation; . . . to offer, whether accepted or not, a forged instrument, with the representation, by words or actions, that the same is genuine." *Id.* at 1387. *See United States v. Holmes*, 453 F.2d 950 (10th Cir. 1972); *United States v. Jenkins*, 347 F.2d 345 (4th Cir. 1965); *Rader v. United States*, 288 F.2d 452 (8th Cir. 1961). Substitution of counterfeit treasury bills for genuine bills amounts to a representation to the unsuspecting owner that the counterfeit bills are genuine. The effect of placing counterfeit treasury bills in a portfolio with intent to defraud is no different from passing and uttering counterfeit treasury bills for value in a market place transaction. In both situations the bills are placed in circulation, thereby defrauding the United States.

■ That the scheme was not carried out as planned is not relevant; the gist of conspiracy is an agreement to commit an offense.[4] *United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 206, 85 L.Ed. 128 (1940); *United States v. Wieschenberg*, 604 F.2d 326, 334 (5th Cir. 1979). Nor is it necessary to prove that a person charged with conspiracy participated in each aspect of the operation. It is sufficient that the defendant knew of the agreement, and with that knowledge voluntarily participated in the agreement. *United States v. Bates*, 600 F.2d 505 (5th Cir. 1979); *United States v. Michel*, 588 F.2d 986 (5th Cir. 1979), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1980).

■ Appellant urges that the evidence offered by the government actually proved two separate conspiracies: the conspiracy charged in the indictment, i. e., to pass *counterfeit* treasury bills, and a separate conspiracy to dispose of *stolen* securities. Multiple conspiracies joined as one operate as a denial of due process. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We do not, however, view this as a multiple conspiracy case. The original scheme involved using counterfeit treasury bills to steal genuine bills, which would in turn be negotiated in Europe. The fact that the plan was simplified to provide that the counterfeit bills be negotiated directly did not alter the fundamental objective of the conspiracy, which was to exchange counterfeit treasury bills for value.[5] We hold, therefore, that there was sufficient evidence to support the conspiracy conviction.

*Evidentiary Issues*

■ Appellant challenges the relevancy of photographs of the building in London purported to be the headquarters of Heller's bank. These photographs revealed that appellant's "bank" was no more than a mail drop. This evidence was clearly relevant to

---

4. Under 18 U.S.C. § 371 proof of at least one overt act in furtherance of the illegal agreement by one of the conspirators is necessary to establish the crime of conspiracy. Here, any number of acts by several different persons are sufficient to satisfy the "overt act" requirement. Appellant himself acted in furtherance of the conspiracy throughout the summer when he travelled around Europe in search of parties who might be interested in the securities.

5. In *United States v. Gonzalez-Carta*, 419 F.2d 548 (2d Cir. 1969), the Second Circuit was faced with a fact pattern analogous to this one, and concluded that the evidence supported a finding of one conspiracy. There, the evidence showed that the defendants originally agreed to print counterfeit Dominican Republic currency. When the counterfeiting of Dominican currency proved unsuccessful, the defendants agreed to counterfeit United States currency. The court stated:

> "The purpose of the conspiracy was at all times the manufacture, possession and distribution of counterfeit currency.
>
> While the indictment charged the counterfeiting of United States currency, the evidence as to the original plan to counterfeit Dominican pesos was properly received as background showing how the conspiracy charged burgeoned with the same equipment and the same actors."

*Id.* at 551.

appellant's motive and intent to defraud as it demonstrates his ability to dispose of the treasury bills in Europe, and its admission was not an abuse of discretion.

At trial the government also introduced, over objection, several business cards seized from appellant at the time of his arrest. The cards variously identified appellant as the president of a travel service, an ordained minister, and executive director of the Florida Legal Rights Council. Appellant argues that the cards were not relevant to any issue in the case and were highly prejudicial. Under Fed.R.Evid. 404(b)[6] evidence of extrinsic acts are not admissible to demonstrate a defendant's bad character, although such evidence may be admissible for other purposes. The government contends that the cards were relevant to the issue of appellant's intent to defraud the United States.

We need not decide whether the business cards were properly admitted under Rule 404(b) because we find that their admission, even if error, was harmless. An error is harmless if the reviewing court is sure, after viewing the entire record, that the error did not influence the jury or had a very slight effect on its verdict. *United States v. Underwood*, 588 F.2d 1073, 1076 (5th Cir. 1979).

In this case the jury heard the detailed testimony of Keats concerning appellant's participation in the scheme. In addition, the government introduced several incriminating statements made by appellant to both British and American officials at the time of his arrest. In light of the entire record, we find that the admission of phony business cards could have had no more than "a very slight effect" on the jury's deliberations. Furthermore, possession of the cards was not a criminal offense, and the cards themselves were not the type of inflamma-tory evidence likely to prejudice the jury. Because the possibility of prejudice was slight, and the evidence against appellant was substantial, we conclude that the admission of the business cards, if error, was harmless.

### Conduct of the British Authorities

Appellant further contends that his arrest did not comport with fourth amendment requirements of probable cause and the securing of a warrant, and that the statements he gave to British authorities were inadmissible because he was not given a *Miranda* warning. Ordinarily, the fourth amendment does not apply to arrests and searches made by foreign authorities in their own country and in enforcement of foreign law. *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). Similarly, statements obtained by foreign officers conducting interrogations in their own nations have been held admissible despite a failure to give *Miranda* warnings to the accused. *Kilday v. United States*, 481 F.2d 655 (5th Cir. 1973).

Two exceptions to this general rule have been recognized. The first, clearly inapplicable here, provides that if the conduct of the foreign officers shocks the conscience of the American court, the fruits of their mischief will be excluded. *United States v. Morrow, supra* at 139. The second exception, and the one urged by appellant, provides that if American officials participated in the foreign search or interrogation, or if the foreign authorities were acting as agents for their American counterparts, the exclusionary rule should be invoked. *United States v. Morrow, supra.*

The record indicates that the participation of American law enforcement of-

---

**6.** Rule 404(b) of the Federal Rules of Evidence provides:

(b) *Other crimes, wrongs or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accidents.

For an analysis in detail of Rule 404(b), *see United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

ficers in appellant's arrest was peripheral at most. It is true that but for a tip from an American official appellant probably would not have been arrested. However, appellant was detained and the treasury bills seized before any American agents arrived. He was charged initially with violating British, not American, law. When the American agent arrived, he interviewed appellant, but only after first obtaining permission from the British and then only for the limited time allowed by them.[7] The American agent and the British officers did not exchange information regarding their separate interrogations of appellant. We conclude that the British officers were not acting as agents of American officers. Thus, appellant could not invoke the protection of the fourth and fifth amendments.

*Prosecutor's Closing Argument*

 The government introduced photographs of appellant's purported "bank" in London as part of its case in chief. Believing that these photographs were produced to cast doubt on the legitimacy of the London bank, defense counsel in his closing argument asked why the government had not also produced photos of appellant's bank on the island of St. Vincent. In rebuttal, the prosecutor stated: "It's not our responsibility to bring in all of this, ladies and gentlemen. If there is a bank down there, Mr. Heller could have brought in a picture of it."

Defense counsel immediately objected and moved for a mistrial. The trial court denied the motion for a mistrial but cautioned the jury to disregard the remark.[8]

Appellant contends that the prosecutor's comment was violative of the rule in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1969), forbidding comment upon a defendant's failure to testify. Ap-

pellant further urges that the comment was so prejudicial that a cautionary instruction could not cure the damage. We find no merit in this contention. We do not construe the remark as a comment upon defendant's failure to testify. Moreover, the curative charge remedied what damage, if any, that might have arisen from the comment.

AFFIRMED.

---

**7.** While in custody in London appellant made two statements to United States Secret Service Agent Petievich. Because Petievich gave appellant a full *Miranda* warning, Petievich's testimony concerning those statements was admissible.

**8.** The court instructed:

Ladies and gentlemen of the jury, there is no incumbency upon the defendant to bring in evidence or prove anything.

The defendant need not do anything and, therefore, you are to disregard the remark made by Mr. Hanna with regard to what you just heard; I'm striking it from the record.