**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gary L. SHIVELY, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**G. Winfield PARDEE,
Defendant-Appellant.**

**Nos. 82–2192, 82–2436.**

United States Court of Appeals,
Seventh Circuit.

Argued May 11, 1983.

Decided Aug. 8, 1983.

Rehearing Denied Oct. 5, 1983.

262

Brent D. Holmes, Mattoon, Ill., Sidney I. Schenkier, Chicago, Ill., for defendants-appellants.

Robert T. Coleman, Asst. U.S. Atty., Frederick J. Hess, U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before CUDAHY and POSNER, Circuit Judges, and ROSENN, Senior Circuit Judge.*

POSNER, Circuit Judge.

Messrs. Shively and Pardee were convicted of bank fraud and appeal on a variety of substantive and procedural grounds.

Shively was the president of the First National Bank of Marshall, Illinois, a small country bank. His troubles began when he bought (from the chairman of the board of the bank) a lot on which to build a house for himself. He entered into an oral agreement with a contractor to build the house for $80,000 and got a commitment from another bank for a $64,000 mortgage. The commitment enabled him to get interim financing. But in the course of construction it became clear that the house would cost much more than expected, and though Shively was able to get the mortgage commitment raised to $80,000 he came up $20,000 short on being able to finance the construction. Unable to obtain additional loans from any bank or other financial institution, Shively turned to Pardee, a partner in a firm called Design Plus which was doing some work for Shively's bank. Shively asked Pardee to make him either a personal loan for $20,000 or a loan from Design Plus for this amount. When Pardee refused, Shively asked him whether he would borrow $20,000 from the bank and relend it to him. Pardee agreed and Shively prepared a promissory note stating that the loan was for "business expense and marketing operation." Shively then called Pardee and told him the bank had approved the loan. Pardee testified that he asked Shively whether the bank's board of directors understood "that I am going to get the money and it's going to be given back to you," and Shively responded, "Everything is okey dokey." Pardee signed the note, received the money, deposited it in another bank, and signed an agreement with Shively to lend him $20,000.

Shively had not told anyone at the bank the true purpose of the loan to Pardee, and

in fact had approved it on his own authority without submitting it to the loan committee or board of directors. The promissory note came due two years later but in the interim Design Plus had gone broke, to be followed shortly by Pardee. Pardee told the bank he would repay the note when Shively repaid him. This was when the bank first learned of the true purpose of the loan to Pardee. That loan has never been repaid, though Shively has partially repaid Pardee's loan to him.

Shively and Pardee were tried together. The jury convicted Pardee of having falsely stated the purpose of the loan, in violation of 18 U.S.C. § 1014, and of having conspired with Shively to violate both 18 U.S.C. §§ 656 (willful misapplication) and 1014, but it acquitted him of having aided and abetted Shively in violating section 656. The jury convicted Shively of having aided and abetted Pardee in violating section 1014, of having conspired with Pardee to violate sections 656 and 1014, and of having violated section 656 by concealing from the bank that the proceeds of the loan to Pardee would be used by Shively himself.

█ The false-statement statute, 18 U.S.C. § 1014, provides: "Whoever knowingly makes any false statement . . . for the purpose of influencing in any way the action of . . . any bank the deposits of which are insured by the Federal Deposit Insurance Corporation" shall be guilty of a crime. There is no question that by signing a promissory note which contained a statement that he knew was false (that the purpose of the loan was "business expense and marketing operation") Pardee was making a false statement within the meaning of the statute. Whether his purpose was to influence the bank's action is at least doubtful, as we shall see. What is not doubtful is that the government failed to prove beyond a reasonable doubt that the First National Bank of Marshall was insured by the FDIC in 1978 when the false statement was made.

* Hon. Max Rosenn of the Third Circuit, sitting by designation.

■ The only evidence of insured status that was introduced was a certificate of insurance that the FDIC had issued to the bank in 1969. The certificate states only that the bank was insured on that date. No evidence was presented, as in *United States v. Skiba,* 271 F.2d 644, 645 (7th Cir.1959), that the bank was still operating under the certificate at the time of the offense. Even if *United States v. Crisp,* 435 F.2d 354, 360–61 (7th Cir.1970), deliberately omitted mention of that qualification (that there must be evidence bringing the certificate up to date) in citing *Skiba,* it is readily distinguishable. The issue in *Crisp* was venue, which the government need only prove by a preponderance of the evidence, see, e.g., *United States v. Bowdach,* 414 F.Supp. 1346, 1356 (S.D.Fla.1976), aff'd, 561 F.2d 1160 (5th Cir.1977)—not whether an element of the offense had been proved, as in this case and *Skiba.*

■ *United States v. Platenburg,* 657 F.2d 797, 799 (5th Cir.1981), reversed a conviction under section 1014 because the only evidence of insured status was a seven-year-old certificate of insurance; here it was nine years old. Although the bank in *Platenburg* was not a national bank as in this case, and national banks are required by law to be insured by the FDIC, 12 U.S.C. §§ 1814(b), 1818, you cannot infer from the fact that someone is required by law to do something that he has done it. True, cancellation of federal deposit insurance for failure to pay the annual assessments (premiums) required by 12 U.S.C. § 1817(b), or for any other reason, is not automatic; it requires following the procedures laid down in 12 C.F.R. §§ 308.23–.31 (1983). Still, a national bank like any other bank can lose its insured status.

In *United States v. Knop,* 701 F.2d 670, 672–74 (7th Cir.1983), this circuit's most recent statement on proof of insured status, bank officers testified at the trial that the bank "is" insured. "Taken woodenly and literally the testimony might seem to refer only to the time of the trial. In context it could plausibly have been taken by the jury as referring to the time of the commission

of the offenses...." *Id.* at 673 (footnote omitted). See also *United States v. Safley,* 408 F.2d 603, 605 (4th Cir.1969). But there is no way in which a certificate of insurance issued in 1969 could be taken to refer to a bank's insured status in 1978 without any other evidence. Although a stipulation between the parties recites that the Marshall bank was insured in 1978, the government did not introduce the stipulation into evidence. As a result, the record contains no evidence—beyond the stale 1969 certificate which just as unaccountably *was* placed in evidence—of an essential element of a section 1014 offense. We are given no reason other than inadvertence why the stipulation was not introduced; *Platenburg* had been decided the year before the trial in this case. Pardee must be acquitted of the charge of violating section 1014 and Shively of aiding and abetting that violation.

■ The problem of insured status does not arise with respect to section 656, which provides: "Whoever, being an officer . . . or employee of . . . any . . . national bank . . . willfully misapplies any of the moneys . . . of such bank" shall be guilty of a crime. Shively argues that he could not be guilty of misapplication when the bank could have looked to Pardee, the nominal borrower and a man of substantial means at the time, for repayment of the loan the proceeds of which ended up in Shively's pockets. This would be a tenable argument if Shively, the ultimate borrower, had not been an employee of the bank. *United States v. Gens,* 493 F.2d 216, 222 (1st Cir. 1974); *United States v. Gallagher,* 576 F.2d 1028, 1045–46 (3d Cir.1978). But it has been held to be misapplication per se for a bank officer or employee to funnel funds to himself by making a bank loan to a third party. *United States v. Krepps,* 605 F.2d 101, 106–08 (3d Cir.1979); *United States v. Steffen,* 641 F.2d 591, 597 (8th Cir.1981).

■ The meaning of "willful misapplication" in section 656 has long been a subject of debate and uncertainty. See *United States v. Docherty,* 468 F.2d 989, 992–95 (2d Cir.1972). At the very least, however, the term must require that the

bank's money have been used for a purpose that the bank would not have agreed to had it known what the purpose was. In *Gens*, for example, it was entirely possible that if the defendant's superiors in the bank had known that the nominal borrower intended to hand over the money to a third party to whom the bank would not have loaned the money directly, the bank would still have approved the loan, trusting to the credit of the nominal borrower; banks often lend money to small-loan companies whose customers they would never lend money to directly. But the Marshall bank would never have loaned Pardee money to hand over to the bank's president, no matter how sterling Pardee's credit was at the time. With Pardee's company not only a contractor of the bank but a borrower from it on other loans, his acting as a conduit for funds to the bank's president created a conflict of interest and placed the bank in serious jeopardy of violating the legal limitations on lending to its own officers. See 12 U.S.C. § 375a; 12 C.F.R. §§ 215.3(a)(8), 215.4(b) (1983); *Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir.1979). There is no law against a bank customer's lending to a bank officer, but Pardee refused to lend Shively his own money; and the bank would not wittingly have helped Pardee get a hold over Shively by providing Pardee with money to lend to Shively.

■ This is not to say that every unauthorized loan by a bank officer is a willful misapplication of bank funds. Concerned with the reach of this criminal statute if read so broadly, and mindful that the statute originally required proof of intent to "injure or defraud" the bank or "deceive" a bank officer and that these words were dropped by a reviser without intent to alter the meaning of the law, courts including our own have read these words back into section 656. *United States v. Docherty, supra*, 468 F.2d at 994–95; *United States v. Larson*, 581 F.2d 664, 667 (7th Cir.1978); see *United States v. McAnally*, 666 F.2d 1116, 1119 (7th Cir.1981). But it is clear that Shively in lending the bank's money to Pardee did intend to defraud the bank, by getting money from it for his

personal use, which the bank would not have permitted had it known the circumstances.

■ Although there thus was enough evidence to convict Shively of violating section 656, we must consider whether either he or Pardee could be convicted of conspiring to violate sections 656 and 1014, as charged in the indictment, when neither could be convicted of a completed offense under section 1014 because of the government's failure to prove insured status. Since no instruction was asked or given requiring that the jury, to convict of conspiracy, find that the objective of the conspiracy was to violate both statutes rather than either, maybe there was just a harmless variance between pleading and proof. Cf. *United States v. Brown*, 521 F.Supp. 511, 520 and n. 6 (W.D.Wis.1981). But assuming the government had to prove a conspiracy to violate section 1014 as well as section 656, we think it succeeded. "[I]t does not matter that the ends of the conspiracy were from the beginning unattainable." *United States v. Giordano*, 693 F.2d 245, 249 (2d Cir.1982). See *United States v. Waldron*, 590 F.2d 33, 34 (1st Cir.1979); *United States v. Rose*, 590 F.2d 232, 235–36 (7th Cir.1978); *United States v. Senatore*, 509 F.Supp. 1108, 1110–11 (E.D.Pa.1981); LaFave & Scott, Handbook on Criminal Law 475 (1972) ("the conspiracy cases have usually gone the simple route of holding that impossibility of any kind is not a defense"). Although *Platenburg* dismissed the conspiracy charge along with the substantive charge, it did so without any separate discussion of the former; and the impossibility of committing the substantive offense is no more a defense to conspiracy in the Fifth Circuit than anywhere else. See *United States v. Albert*, 675 F.2d 712, 715 (5th Cir.1982).

■ This is not to say that the government can use the general federal conspiracy statute (18 U.S.C. § 371) to punish all conspiracies to defraud banks, just because most banks are federally insured. But it is enough if the bank is insured although the defendants do not know it, see

*United States v. Feola,* 420 U.S. 671, 676 n. 9, 95 S.Ct. 1255, 1260 n. 9, 43 L.Ed.2d 541 (1975); the federal concern with punishing the conspiracy in such circumstances is clear. And it is also enough if the defendants intend to defraud a federally insured bank, even though, unbeknownst to them, the bank has lost its insurance. That would be like a conspiracy to transport stolen property worth more than $5,000, which *Carlson v. United States,* 187 F.2d 366, 369–70 (10th Cir.1951) (discussed approvingly in our circuit's decision in *Rose, supra,* 590 F.2d at 236), held was proved by showing that the defendants intended to steal property of that value although the actual value turned out to be less. The evidence that the defendants in this case intended to defraud a federally insured bank was strong. The bank, as they well knew, was a national bank, required by law to be federally insured; it had once been insured; it continued to represent to the public that it was insured; and for all anyone knew at the time of the offense it still was insured (in fact it still was, though the stipulation to that effect was not placed in evidence). Proof that it was insured during the period of the conspiracy was therefore not required to sustain the conspiracy convictions.

Assuming, still, that the conjunctive wording of the conspiracy charge matters, there was enough evidence to convict Pardee of having conspired with Shively to violate section 656 as well as section 1014—conspired, that is, to misapply bank funds. Pardee had substantial experience in the banking business, having been a director, an executive vice-president, and, briefly, the president of a bank. Unlike the borrower in *Docherty, supra,* 468 F.2d at 995, he knew—or so the jury could have found—that the promissory note falsely stated the purpose of the loan. And with all his banking experience he must have known that the bank would not knowingly have loaned him money for the use of a bank officer, and therefore that he was participating in a scheme to defraud the bank. It is unimportant whether he did so out of pure friendship, or, as is more likely, to ingratiate himself with the officer of a bank with which he did business both as supplier and as borrower. Although we have no reason to question the truth of Pardee's testimony that Shively told him, "Everything is okey dokey," Shively may have meant no more than that the bank had agreed to the loan, as distinct from the bank's having known of the ultimate, and improper, destination of the loan proceeds. Finally, the fact that the jury acquitted Pardee of aiding and abetting Shively's violation of section 656 does not invalidate his conviction for conspiracy. A jury is allowed to go easy on a defendant by acquitting him on one count even though consistency might require either conviction on that count or acquittal on all counts. See *United States v. Heller,* 625 F.2d 594, 597 (5th Cir.1980).

Only two of the procedural issues have enough arguable merit to warrant discussion. One is whether the trials of Shively and Pardee should have been severed. Severance is argued in almost every case where there are multiple defendants, and appellate courts give the argument short shrift, regarding it as a matter within the discretion of the trial judge. E.g., *United States v. Cavale,* 688 F.2d 1098, 1107 (7th Cir.1982); *United States v. Hedman,* 630 F.2d 1184, 1200 (7th Cir.1980); *United States v. Johnson,* 478 F.2d 1129, 1131 (5th Cir.1973) ("a defendant has an extremely difficult burden of showing on appeal that the lower court's action was an abuse of discretion"). On the one hand, there is considerable cost to the government in having to conduct two or more separate trials arising out of the same criminal transaction; on the other hand, a joint trial may prejudice some or conceivably all of the defendants by confusing the jury. The balancing of these considerations is better done by the trial court than by the appellate court because the trial court has a better feel for the ability of a jury to assimilate evidence without confusing the defendants with one another. Another reason for limited appellate review is that, to avoid costly mistrials, the decision whether to sever should if possible be made before trial, and therefore at a time when there is no

record on which to base informed appellate review of the decision.

The usual argument for severance is that the defendant seeking it would be prejudiced by being tried together with guiltier defendants with whom he might be merged in the jurors' minds. The main argument here is different. Shively, the guiltier of the two defendants, moved for severance on the ground that Pardee's defense was so antagonistic to his own that once he knew Pardee would take the stand he had to do likewise; thus his right under the Fifth Amendment not to be compelled to incriminate himself was infringed.

This argument has little to do with the issue of improper joinder as ordinarily presented. The argument is not that the jury was unable to separate Shively's case from Pardee's. It is not an argument about jury confusion at all, but a pure Fifth Amendment argument, and not a good one. Circumstances—a cogent prosecution witness, or a codefendant who is trying to exculpate himself at the defendant's expense—often force a defendant to take the stand in his own defense; yet there is no infringement of the Fifth Amendment. If the government had given Pardee immunity and then called him to testify against Shively, thus putting pressure on Shively to testify on his own behalf, Shively could not complain that his Fifth Amendment rights had been violated. No more can he complain about joinder on this ground.

But Shively also casts his argument for severance in a more conventional form by appealing to a line of cases which hold that if codefendants have inconsistent defenses severance must be granted if—but only if—the defenses "conflict to the point of being irreconcilable and mutually exclusive." *United States v. Crawford*, 581 F.2d 489, 491 (5th Cir.1978). See, e.g., *United States v. Kopituk*, 690 F.2d 1289, 1316 (11th Cir.1982). The danger is that in a case of irreconcilable and mutually exclusive defenses the jury is quite likely to convict at least one of the defendants without carefully weighing the evidence of his guilt. This is not such a case. The principal discrepancy between the two defendants' stories was that Pardee testified that Shively had assured him that the loan was authorized even though the proceeds were intended for Pardee; this falls short of the type of conflict of which cases like *Crawford* and *Kopituk* speak. At all events, we do not think that Shively was made appreciably worse off by being tried with Pardee. Pardee made a rather appealing defendant since he had not profited personally from the various crimes that were charged and some of the jury's expected sympathy for him might have lapped over to Shively. More important, Shively's story which Pardee contradicted—that the loan was a bona fide loan for Pardee's business needs, unrelated to Pardee's personal loan to him—was incredible, and would not have been believed even if Pardee had not testified.

The last issue we discuss relates to the government's use of samples of Shively's handwriting. Before Shively's first trial (which ended in a hung jury), he had been ordered to supply the government with samples of his signature, and had complied. The government hired an expert who concluded that Shively had attempted to disguise his handwriting. The government wanted to present the expert's testimony at the first trial but the district judge refused to allow it. At the second trial the judge, after careful analysis, reversed his ruling, and the expert testified. At both trials the authenticity of Shively's signature on all the documents material to the case was stipulated, so that the expert's testimony was not for identification but to show that Shively had disguised his handwriting, thus betraying consciousness of guilt. Shively argues both that this testimony violated the Fifth Amendment and that the pretrial order (and Rule 16 of the Federal Rules of Criminal Procedure, on which the order was based) was violated by the government's failure to give the expert's report to the defense before the second trial.

The Fifth Amendment argument is foreclosed by *Gilbert v. California*, 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953–54, 18 L.Ed.2d 1178 (1967), which held that a

handwriting sample was physical rather than testimonial evidence and therefore not protected by the Fifth Amendment. Of course, if a defendant were told to give a handwriting sample in the form of a confession dictated by the police the sample could not be used as evidence of the truthfulness of the confession. But disguising your handwriting is not testimony; it is an effort to prevent the government from obtaining physical evidence to which it is entitled. If the police drew blood and the defendant poured the vial of blood down the drain, the police could testify to his conduct; it was the same here.

Rule 16(a)(1)(D) of the Federal Rules of Criminal Procedure requires the government to turn over to the defendant the results of tests "upon request of a defendant." Shively's counsel knew that the government wanted to introduce the evidence of his alleged disguising of his handwriting, because the government had tried to do so at the first trial, yet he made no request for the expert's report until at the second trial the government again moved to be allowed to introduce the evidence and the court granted the motion. At this point counsel moved for a continuance, which would have been disruptive and which the district judge was not required to grant. Although it would have been better if the government had furnished the expert's report unasked to defense counsel before the start of the second trial, the district judge's refusal to grant a continuance was not reversible error. Cf. *United States v. Wolfish,* 525 F.2d 457, 460–61 (2d Cir.1975) (per curiam). Counsel was able to cross-examine the expert effectively even though he lacked access to the expert's report; and while the introduction of this testimony may have added a somewhat lurid note to the trial, the evidence of Shively's willfulness—the only issue to which the testimony was relevant—was overwhelming without it. The testimony was, at worst, harmless error.

To summarize, we reverse Pardee's conviction of violating 18 U.S.C. § 1014 and Shively's conviction of having aided and abetted that violation, with directions to enter judgments of acquittal; but we affirm both men's convictions for conspiracy, and Shively's conviction for having violated 18 U.S.C. § 656. Although the district judge imposed consecutive sentences on each count, we shall remand to give the judge an opportunity, if he desires, to re-sentence one or both defendants. Since a sentence for one offense could be influenced (and properly so) by the judge's knowledge that the defendant was guilty of another offense as well, we think it the better practice, when one count is set aside on appeal, to give the sentencing judge a chance to reconsider his sentence on the remaining, valid counts.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.