**UNITED STATES of America**

**v.**

**Richard J. ADLER.**

**No. A–04–CR–266(1)–LY.**

United States District Court,
W.D. Texas,
Austin Division.

March 5, 2009.

John Marcus Bustamante, Fish & Richardson, PC, Austin, Paul A. Calli, Carlton Fields, Miami, FL, Betty H. Chen, Fish & Richardson, PC, Austin, Martha M. Hopkins, Andrews Kurth LLP, Austin, Ronald Casey Low, Andrews Kurth, LLP, Austin, for Richard J. Adler, Defendant.

Michael Nicholas Varrone, U.S. Food and Drug Administration, Rockville, MD, Michelle Evette Fernald, Assistant United States Attorney, Austin, for USA, Plaintiff.

### *ORDER ON PRETRIAL MOTIONS*

LEE YEAKEL, District Judge.

Before the Court are Defendant Richard J. Adler's Motion to Dismiss the Indictment Based on an Improper Extradition filed January 16, 2009 (Clerk's Document 66), Defendant Richard J. Adler's Motion to Suppress Evidence Obtained from Illegal Search of Defendant Adler's Residence filed January 16, 2009 (Clerk's Document 68), Government's Response to Defendant's Motion to Suppress Evidence Obtained from Spain Pursuant to a Treaty Process and Motion to Dismiss the Indictment Alleging an Improper Extradition filed January 27, 2009 (Clerk's Document 74), Defendant Richard J. Adler's Reply in Support of his Motion to Dismiss the Indictment Based on an Improper Extradition filed February 9, 2008 (Clerk's Document 78), Defendant Richard J. Adler's Reply to Government's Response to Defendant's Motion to Suppress Evidence Obtained from Illegal Search of Adler's Residence filed February 12, 2008 (Clerk's Document 80), Government's Supplemental Submission of Evidence Relating to Defendant's Motion to Dismiss the Indictment Alleging an Improper Extradition filed February 26, 2009 (Clerk's Document 94), Defendant Richard J. Adler's Motion to Dismiss Counts One, Two, and Four of the Indictment filed January 16, 2009 (Clerk's Document 67),[1] Government's Response to Defendant's Motion to Dismiss Counts One, Two, and Four of the Indictment filed January 27, 2009 (Clerk's Document 73), Defendant Richard J. Adler's Reply to the Government's Response to Defendant's Motion to Dismiss Counts One, Two, and Four of the Indictment filed February 19, 2009 (Clerk's Document 82), Defendant Richard J. Adler's Motion for Bill of Particulars filed January 16, 2009 (Clerk's Document 63), Defendant Richard J. Adler's Motion to Strike Surplusage from the Indictment filed January 16, 2009 (Clerk's Document 64), Government's Response to Defendant's Motion for a Bill of Particulars [ ] and Motion to Strike Surplusage from the Indictment filed January 27, 2009 (Clerk's Document 75), and Adler's Reply to Government's Response

1. On March 3, 2009, the Government moved to dismiss Count Four of the indictment. The Court granted the motion by separate order. The Court dismisses Adler's motion insofar as it seeks dismissal of Count Four.

to Defendant's [ ] Motion for a Bill of Particulars, and Motion to Strike Surplusage from the Indictment filed February 9, 2009 (Clerk's Document 77).

On February 20, 2009, the Court conducted a hearing in this cause and heard oral argument on Adler's motion to dismiss the indictment based on an improper extradition, motion to suppress, and motion to dismiss Counts One and Two of the indictment. The remaining motions were submitted on the pleadings. After considering the motions, responses, replies, attached exhibits, evidence admitted at the hearing, arguments of counsel, and the applicable law, the Court will deny the motions.

Defendant Richard J. Adler is now charged in a three-count indictment. Count Two charges Adler with knowingly distributing human growth hormone for unauthorized use on or about December 23, 1999. *See* 18 U.S.C. § 2; 21 U.S.C. § 333(e). Count Three charges Adler with introducing into interstate commerce misbranded human growth hormone. *See* 18 U.S.C. § 2; 21 U.S.C. §§ 331(a); 333(a)(2); 352(a), (f)(1). Count One charges Adler with conspiracy to commit such acts. *See* 18 U.S.C. § 371.

By his motion to dismiss the indictment, Adler seeks dismissal of all charges against him. He argues this Court lacks personal jurisdiction over him because his extradition from Spain violated the duality requirement of the extradition treaty between the United States and Spain. By his motion to suppress, Adler seeks to suppress evidence seized at his residence in Mallorca, Spain, on October 11, 2001, and all derivative evidence. By his motion to dismiss Counts One and Two of the indictment, Adler argues that the Court should dismiss such counts because they fail to charge a crime or state facts suffi-

cient to constitute an offense against the United States.

### Motion to Dismiss the Indictment Based on an Improper Extradition

Adler argues that, under the doctrine of dual criminality, an accused person can only be extradited if the conduct of which he is accused is criminal under the law of both signatories to the extradition treaty. Adler argues the Government has not shown that the acts of which he is accused are criminal under Spanish law; he was therefore improperly extradited, and this Court should dismiss all counts of the indictment. The Government responds that Adler lacks standing to contest his extradition in this Court, because any decision on extradition is determined by the requesting country. The Government also cites to the Spanish extradition orders that conclude that the charged offenses are criminal under Spanish law.

A person may only be extradited from one country to another if the charged offense is criminal in both the requesting and surrendering country. *Collins v. Loisel*, 259 U.S. 309, 310, 42 S.Ct. 469, 66 L.Ed. 956 (1922); *Bernstein v. Gross*, 58 F.2d 154, 155 (5th Cir.1932). Neither the name of the offense nor its elements need correspond between the countries; it is sufficient that the conduct is criminal in both. *Collins*, 259 U.S. at 312, 42 S.Ct. 469. The duality requirement is built into the Treaty on Extradition Between the United States and Spain: "[p]ersons shall be delivered up according to the provisions of this Treaty for any of the following offenses provided that these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year ... [including] any offense against the laws relating to ... chemicals or substances injurious to health." U.S.-Spain, art. II, May 29, 1970, 22 U.S.T. 737, 738–39.

■ The Fifth Circuit has declined to determine whether an individual has standing to contest his extradition. Instead, it has assumed standing, considered extradition challenges on the merits, and found extraditions proper. *United States v. Kaufman,* 858 F.2d 994, 1007, 1009 n. 5 (5th Cir.1988) ("we find it unnecessary to address the government's contention that [defendants] lack standing to raise the alleged treaty violation as a bar to personal jurisdiction . . . ."); *see also United States v. LeBaron,* 156 F.3d 621, 627 (5th Cir. 1998);[2] This Court will do the same.

■ The surrendering country determines whether an offense is extraditable. *See Johnson v. Browne,* 205 U.S. 309, 316, 27 S.Ct. 539, 51 L.Ed. 816 (1907); *Gallo–Chamorro v. United States,* 233 F.3d 1298, 1308 (11th Cir.2000); *United States v. Saccoccia,* 58 F.3d 754, 766 (1st Cir.1995); *United States v. Van Cauwenberghe,* 827 F.2d 424, 429 (9th Cir.1987). Courts give substantial deference to the surrendering country's initial determination that a charged offense is criminal in that country. *See Johnson,* 205 U.S. at 316, 27 S.Ct. 539; *Saccoccia,* 58 F.3d at 766; *Van Cauwenberghe,* 827 F.2d at 429; *McGann v. United States Bd. of Parole,* 488 F.2d 39, 40 (3d Cir.1973) *(per curiam ).* The Fifth Circuit has upheld informal extraditions when the surrendering country did not object. *See Kaufman,* 858 F.2d at 1007, 1009; *Zabaneh,* 837 F.2d at 1261. Courts have also

upheld extraditions in the face of post-extradition objection by the surrendering country. *See Gallo–Chamorro,* 233 F.3d at 1307 (finding no duality violation despite post-extradition Colombian diplomatic note objecting to jury instruction as violating terms of extradition).

On October 11, 2006, the Second Section of the Penal Courtroom of the Spanish National Court granted the United States's extradition request as to Adler. The Plenary Session of the Penal Courtroom of the National Court of Spain affirmed the extradition order on December 18, 2006.[3] Both the Second Section and the Plenary Session specifically considered Adler's argument that his extradition violated the duality requirement. The Second Section concluded:

> [i]n regards to the inexistence of double incrimination, we should note that the commercialization/distribution of medical/pharmaceutical products in Spain without a required prescription from a physician; the lack of a distribution license, [and] not meeting the required conditions for a medical product all constitute a crime against public health, which is stipulated and punished in article 359 of the Penal Code, and which carries a penalty of six months to three years imprisonment, which also means that it fulfills the required minimum punishment.

2. Although *Kaufman* and *LeBaron* both address the doctrine of specialty, as opposed to duality, courts have held that the distinction between the two doctrines is immaterial for the purpose of deciding whether an individual has standing to contest his extradition. *Gallo–Chamorro v. United States,* 233 F.3d 1298, 1306 (11th Cir.2000); *see also Bernstein,* 58 F.2d at 155 (addressing merits of duality challenge to extradition). "Specialty" requires that the requesting country prosecute only those offenses the surrendering country approves as extraditable, whereas "duality" ad-

dresses whether the conduct is criminal in both countries. *See LeBaron,* 156 F.3d at 626; *Gallo–Chamorro,* 233 F.3d at 1306.

3. At the February 20, 2009 hearing, the Government presented a draft translation of the Plenary Session's final extradition order. The Government has since supplemented the record with final translations of both the Second Section's extradition order and the Plenary Session's final order, both of which have been considered by this Court.

The Plenary Session also addressed Adler's duality argument:

> [n]either is the supposed infraction of the principle of double incrimination found; an allegation which claims that the facts that form the basis of the complaint by the American authorities do not constitute a crime against the public health, nor trafficking, [but instead] comparing it, if at all, to a crime against industrial property.
>
> [T]he individual petitioned is being charged with … the distribution of human Growth Hormone for an unauthorized use; the introduction of a misbranded drug into interstate commerce with the intent of defrauding or misleading; and knowingly distributing prescription medication on the wholesale market without a license … which constitute infractions to the legislature of the requesting State, according to applicable penal law under Title 18, United States Code, Sections 371 and 2 and Title 21, Section 331(a) and (t), and Section 333(a)( and (e); *rules of law that correspond in Spanish law to a crime against public health, article 359 of the Penal Code and a crime of trafficking, articles 2 and 3 of Organic Law 12/05 of trafficking control.*

(Emphasis added.)

Adler relies on *United States v. Khan* in arguing that duality has been violated in his case and that the appropriate remedy is dismissal of the indictment. *See* 993 F.2d 1368 (9th Cir.1993). In *Khan*, Pakistan extradited defendant Khan at the request of the United States. *Id.* at 1370. The United States tried Khan on charges of conspiracy to import heroin (Count II) and use of a communication facility to facilitate the heroin conspiracy (Count VIII). Khan was convicted on both counts. *Id.;* *see* 21 U.S.C. § 963; 18 U.S.C. § 843(b). The Ninth Circuit held that Khan's trial

and conviction on Count VIII violated the doctrines of duality and specialty and dismissed his conviction on that count. *Id.* at 1373–1375. Specifically, the *Khan* court stated "we have not been presented with a Pakistani crime that is even analogous to 21 U.S.C. § 843," and therefore held Khan's conviction on Count VIII violated the doctrine of dual criminality. *Id.* at 1372. The court further found, after reviewing the extradition order, that Khan's Count VIII conviction violated the doctrine of specialty, because the extradition order did not expressly allow extradition on that count. *Id.* at 1373–74. Adler's case is distinguishable from *Khan;* the extradition orders before this Court expressly find that the charged offenses are analogous to Spanish crimes and provide sufficient basis for extradition.

This Court declines to disturb the Spanish courts' determination that the charged conduct is criminal under Spanish law and therefore an extraditable offense. The Court finds that the Spanish courts fully considered Adler's duality argument and rejected it. The Court will therefore deny Adler's motion to dismiss the indictment based on an improper extradition.

### Motion to Suppress

#### Background

In December 2000, the United States Attorney for the Northern District of Texas requested assistance from Spain, in investigating Adler, pursuant to the Mutual Legal Assistance Treaty ("MLAT") between the United States and Spain. *See* Treaty with Spain on Mutual Legal Assistance in Criminal Matters, U.S.-Spain, November 20, 1990, S. Treaty Doc. No. 102–21 (1990). The request detailed the United States's investigation of Adler's activities regarding shipping and distributing human growth hormone to the United States. The request further detailed the

offenses Adler was believed to have committed, listed Adler and various business entities as the target of the search, requested that Spain search Adler's residence and places of business for specific items and bank records, and label and handle the seized items and bank records in a specific manner.

A Spanish magistrate initiated proceedings, and, on October 11, 2001, Spanish law-enforcement authorities searched Adler's residence at Camino de Son Beltran, parte Alta, Fuentes de Deia, Mallorca, Spain. During the search, Spanish officials seized human growth hormone, Adler's computers, other materials, and documents. Spanish officials also seized counterfeit Viagra, for which Adler was prosecuted in Spain. Information uncovered during the October 11, 2001 search led to investigators' awareness of Linda Schaffer's connection to Adler's alleged activity and subsequent search of her Medford, Massachusetts home. The Government intends to use the seized human growth hormone and a copy of Adler's computer as evidence in its case in chief.

*Motion to Suppress and the Parties' Arguments*

Adler seeks to suppress the evidence seized from his residence and all derivative evidence seized from Schaffer's residence. Adler argues he is entitled to Fourth Amendment protection because he is an American citizen and the United States was the state actor that conducted the search. Adler argues American officials substantially participated in the search, making the search a joint venture. Adler argues that because he enjoyed a reasonable expectation of privacy under Spanish law, Spanish law must be consulted in determining whether the search was reasonable and in compliance with the Fourth Amendment. He asserts that because a Spanish court found that the search of his home violated Spanish constitutional protections, the search violated Adler's Fourth Amendment rights. Adler alternatively argues that regardless of Spanish constitutional privacy law, the search of Adler's home was not supported by probable cause and therefore violated Adler's Fourth Amendment rights under Fourth Amendment jurisprudence.

The Government responds that the Fourth Amendment does not apply to evidence obtained in searches conducted by foreign agents in their own country. The Government asserts the substantial-participation exception is inapplicable because there is no evidence American officials participated in the search, making this case distinguishable from cases with extensive American officials' involvement. The Government further responds that even if the Court finds the Fourth Amendment applies to the search, the exclusionary rule does not apply when American officials reasonably rely on the representations of a foreign officials that their action is lawful.

Adler replies that Spanish officials conducted the search at the behest of American officials for the purpose of enforcing the laws of the United States. Adler further replies that the good-faith exception to the warrant requirement does not apply in these circumstances; first, because the Government has not produced a facially valid warrant, and second, because only Spanish officials conducted the search.

*Searches and Seizures in Foreign Lands*

■ Generally, the Fourth Amendment exclusionary rule does not apply to searches and seizures conducted in a foreign country by foreign officials. *United States v. Hawkins*, 661 F.2d 436, 455–56 (5th Cir.1981); *United States v. Heller*, 625 F.2d 594, 599 (5th Cir.1980); *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir.1976). Two exceptions to this rule ex-

ist; first, a court may exclude evidence derived from actions by foreign officials that "shock the conscience." *Hawkins* 661 F.2d at 456. Second, a court may apply the exclusionary rule if American officials participated in the search or foreign officials acted as agents for the United States.[4] *Hawkins* 661 F.2d at 456; *Heller,* 625 F.2d at 599; *Morrow,* 537 F.2d at 139. Adler does not argue that the first exception applies. Adler relies on the second exception, whether American officials participated in the search of Adler's residence or Spanish officials acted as American agents.

■ The exclusionary rule does not apply solely because American authorities provide information to foreign officials that results in a search and seizure. *See Hawkins,* 661 F.2d at 455–56 (American authorities notified Panamanian authorities of plane crash in Panama; Panamanians seized evidence from plane); *Heller,* 625 F.2d at 599–600 (FBI advised British authorities that defendant was traveling abroad in possession of counterfeit treasury bills; British authorities detained defendant for violations of British law and seized bills); *Morrow,* 537 F.2d at 139–40 (American authorities notified Canadian authorities of potential informer in Canada, but took no part in resulting Canadian search and seizure); *Birdsell v. United States,* 346 F.2d 775, 782 (5th Cir.1965) (American authorities supplied information to Mexican officials, who stopped defendant in Mexico for violating Mexican law and seized evidence from defendant's person).

■ Additionally, the presence of an American official at a search and seizure does not necessarily signify the requisite "participation" to invoke the exclusionary rule. *See Heller,* 625 F.2d at 600 (American agent briefly interviewed defendant after his detention, on schedule set by British authorities); *Government of Canal Zone v. Sierra,* 594 F.2d 60, 71–72 (1979) (Canal Zone officer accompanied Panamanian police to defendant's residence; police seized items, some of which were later released to Canal Zone officer).

Adler's case is distinguishable from *Hawkins, Heller, Morrow,* and *Birdsell,* in which American authorities merely informed foreign officials of potentially criminal activity that the foreign officials then chose to pursue. Adler points out that the American MLAT request detailed specific evidence to be seized by Spanish authorities and also directed them where to search, why such evidence was desired, and how to handle the evidence.

Adler cites cases holding that American authorities so substantially participated in foreign searches as to make them joint ventures subject to Fourth Amendment protection. *See United States v. Peterson,* 812 F.2d 486, 488–90 (9th Cir.1987) (American agents termed their actions "joint investigation" and participated in daily decoding and translating of intercepted transmissions with Thai authorities); *United States v. Hensel,* 699 F.2d 18, 25 (1st Cir.1983) ("joint venture" involved high-seas chase and search by American and Canadian vessels, Americans began chase, requested Canadian aid, urged Canadians to seize ship, showed firepower, provided backup and interpreters to Canadians, and participated in second search). Adler's case is distinguishable from *Peter-*

---

4. Other courts have stated Fourth Amendment protections apply to foreign searches if American officials "so substantially participated in the raids so as to convert them into joint ventures between the United States and the foreign officials." *Stonehill v. United States,* 405 F.2d 738, 743 (9th Cir.1968). The Fifth Circuit has not explicitly adopted the *Stonehill* standard. *Morrow,* 537 F.2d at 141.

*son* and *Hensel,* as the level of American participation in each of those cases far surpasses American involvement here.[5] The facts of this case therefore fall in the murky area between the limited American participation in *Hawkins, Heller, Morrow,* and *Birdsell* and the significant participation in *Peterson* and *Hensel.*

■ Because this search was conducted pursuant to an MLAT request, the Court has reviewed the few cases addressing suppression of evidence in such circumstances. Two recent Southern District of New York cases reach opposite conclusions. In *United States v. Gomez–Castrillon,* defendants, Colombian citizens sought to suppress wiretap evidence obtained from Colombia pursuant to an MLAT request. No. S2 05CR 156(CM), 2007 WL 2398810, *1 (S.D.N.Y. Aug. 15, 2007). The MLAT request submitted to Colombian authorities requested wiretaps of specific telephone numbers. The Colombians effected the request and also investigated additional numbers of interest to them. *Id.* at *2. The court held that, as Colombian citizens, defendants could not invoke Fourth Amendment protections. *Id.* at *3. The court also held that a constitutional challenge to the relevant wiretaps

would fail even if the Fourth Amendment applied to foreign citizens.[6] *Id.* The court held "[h]ere, Colombian law enforcement officials were acting as agents of their own, sovereign government responding to a request made under a bilateral treaty. Responding to an MLAT by conducting an investigation in one's own country does not render foreign officials agents of the United States." *Id.* at *4. The *Gomez–Castrillon* court found it significant that Colombian authorities conducted their own investigation in response to the MLAT; American agents did not monitor the wiretaps or translate the results; American agents did not have immediate access to the recordings; American agents did not provide money or wiretapping equipment to the Colombians; the wiretaps were admissible in Colombian courts; and the Colombians wiretapped individuals who were not subject to the American investigation. *Id.* at *4.

In *United States v. Vilar,* defendants sought to suppress evidence seized by British authorities pursuant to an American MLAT request. No. S3 05CR 621(KMK), 2007 WL 1075041, *1 (S.D.N.Y. April 4, 2007). The court stated "there is no dispute that the Metropolitan Police

---

5. The Court finds the district-court cases cited by Adler distinguishable for the same reason; American participation in such searches was more significant than American participation in the October 11, 2001 search of Adler's residence. *See United States v. Juda,* 797 F.Supp. 774, 781–82 (N.D.Cal.1992); *Lau v. United States,* 778 F.Supp. 98, 100–01 (D.P.R. 1991).

6. There is substantial similarity between the Second Circuit's and Fifth Circuit's exceptions to the general rule that Fourth Amendment protections do not apply to foreign searches. *See United States v. Maturo,* 982 F.2d 57, 60–61 (2d Cir.1992).
    First, where the conduct of foreign officials in acquiring the evidence is " 'so extreme that they shock the judicial conscience' a

federal court in the exercise of its supervisory powers can require exclusion of the evidence so seized." Second, where cooperation with foreign law enforcement officials may implicate constitutional restrictions, evidence obtained by foreign officials may be excluded .... Within the second category, [ ] constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials, or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials.
    *Id.* (internal quotations and citations omitted).

officers were acting as the agents of the American Government when they sought the warrants for the search .... Indeed, the Government has conceded that in the absence of the MLAT request, British law enforcement officials likely would not have sought a warrant to search and seize [the relevant] records." *Id.* at *54. The court proceeded to analyze whether the search was reasonable under British law. *Id.* at *54–58.

Overall, the Court finds *Gomez–Castrillon*'s analysis more persuasive than that of *Vilar*. Although Adler's facts do not align precisely with those in *Gomez–Castrillon*, they are sufficiently similar for that court's holding—that an MLAT request does not make a complying foreign government an American agent—to be persuasive to this Court.

The record reflects that American authorities did not obtain the seized evidence until October 2002, a year after the search was conducted. At that time, American officials traveled to Spain to review the seized evidence and returning to the United States with it. Although an FBI agent in Madrid was aware of the search, no American official was present at the search. Spanish officers recovered evidence that had not been requested by American authorities, such as the counterfeit Viagra for which Adler was prosecuted in Spain. Overall, the record shows Spanish officers chose how to implement the search, conducted it without American in-

put besides the MLAT request, and benefited from the fruits of the search.

The Court also notes the policy behind the exclusionary rule. The rule's purpose is to deter American officials from violating American constitutional principles; it does not apply to foreign searches because an American court's action is unlikely to affect the conduct of foreign authorities. *Morrow*, 537 F.2d at 139; *see also Hensel*, 699 F.2d at 25. Excluding evidence in this case would be unlikely to affect the conduct of Spanish officials in future Spanish searches, or even affect how the United States and Spain conduct future MLAT-related searches.

Having reviewed the record and the applicable law, the Court finds and concludes that American authorities did not participate in the October 11, 2001 search nor were Spanish officials acting as agents of the United States to the extent necessary to implicate the Fourth Amendment.[7]

## Motion to Dismiss Counts One and Two of the Indictment

Adler argues the Government fails to properly charge the elements of Section 333(e) of Title 21 of the United States Code, under which he is charged in Count Two of the indictment and for which he is charged with conspiracy in Count One. *See* 21 U.S.C. § 333(e) (human-growth-hormone statute). Adler also argues the indictment alleges activity that is not a crime under the statute. The relevant statute states:

> Except as provided in paragraph (2), whoever knowingly distributes, or pos-

---

**7.** Because the Court holds that the Fourth Amendment does not apply to the October 11, 2001 search of Adler's home, the Court need not determine whether the Spanish search was reasonable under Spanish law. Adler argues the Spanish court's suppression opinion, holding that the search violated Spanish constitutional protections, is dispositive on this issue. This Court is not in the same position as the Spanish court, whose holding

was based on the lack of *any* evidence demonstrating probable cause to support the Spanish search warrant. The Spanish court noted that although it was aware of the MLAT request, the request was not before it. This Court finds such distinction significant, as it has considered the MLAT request and will not speculate as to the Spanish court's ruling had the Spanish court reviewed and considered the MLAT request.

sesses with intent to distribute, human growth hormone for any use in humans other than the treatment of a disease or other recognized medical condition, *where such use has been authorized by the Secretary of Health and Human Services under section 355 of this title and pursuant to the order of a physician,* is guilty of an offense punishable by not more than 5 years in prison, such fines as are authorized by Title 18, or both.

*Id.* (emphasis added). The parties dispute whether the emphasized language modifies both "treatment of a disease" and "other recognized medical condition" or only "other recognized medical condition." Adler argues the approval requirement does not modify "treatment of a disease," and therefore distribution for such use is not prohibited.

Adler further argues that because physicians may prescribe human growth hormone for "off-label" uses, distributing human growth hormone for a non-FDA approved indication is not an offense, as long as the distribution is for a medical use pursuant to a physician's order. The Government responds that off-label-use issues do not arise, because Adler was distributing, not prescribing, the drug, and, as applied to a drug distributor, the statute clearly prohibits all unapproved uses.

Adler argues *United States ex rel. Rost v. Pfizer, Inc.* supports his interpretation of the human-growth-hormone statute. *See* 507 F.3d 720 (1st Cir.2007). Rost brought an action against Pfizer, Inc. and its subsidiary Pharmacia Corporation under the False Claims Act. *Id.* at 723; *see* 31 U.S.C. § 3729 *et seq.* Rost alleged that Pharmacia engaged in various marketing practices for its human-growth-hormone drug Genotropin that violated the Food, Drug, and Cosmetic Act (FDCA). Specifi-

cally, Pharmacia encouraged sales representatives to market Genotropin for off-label uses; paid doctors and offered doctors perks for prescribing Genotropin; gave financial incentives to distributors targeting the off-label market, such as "anti-aging" clinics and internet-based vendors; and hired "independent consultants" to promote Genotropin for off-label uses. *Rost,* 507 F.3d at 723–24. The First Circuit affirmed the district court's holding that Rost's complaint failed to meet the pleading requirements for allegations of fraud. *Rost,* 507 F.3d at 723.

■ Adler asserts *Rost*'s statement that "physicians may prescribe Genotropin for non-FDA-approved indications" supports his argument that *distributing* human growth hormone is legal under the human-growth-hormone statute. Adler does not address the second half of the sentence he quotes, which states "but the [FDCA] prohibits pharmaceutical companies from marketing drugs for 'off-label' uses." *Id.* Adler also fails to address the fact that Pfizer "entered into a Deferred Prosecution Agreement with the government as to a criminal information charging the company with one count of violating the FDCA for off-label promotion and distribution of Genotropin." *Id.* at 725. Further, in reaching its holding regarding pleading-fraud-with-particularity, the court stated that Rost's complaint described illegal practices by Pfizer. *Id.* at 732. The Court concludes that *Rost* supports the Government's position that human-growth-hormone distribution for "off-label" uses are illegal. *Rost* does not otherwise construe the human-growth-hormone statute.

■ The question remains whether human-growth-hormone may be distributed without authorization by the Secretary of Health and Human Service, if it is for the "treatment of a disease" and "pursuant to the order of a physician." The Court finds

that the statute's language clearly forbids distribution of human growth hormone, with specific exceptions for treatment of a disease or other recognized medical condition if certain conditions are met. For distribution or possession with intent to distribute to be lawful under the statute, either of the exceptions must have been approved by the Secretary of Health and Human Services and be pursuant to a physician's order. The Court will therefore deny Adler's motion to dismiss Counts One and Two of the indictment.

*Motion for Bill of Particulars and Motion to Strike Surplusage*

The Court has reviewed Adler's Motion for Bill of Particulars, Motion to Strike Surplusage from the Indictment, and the related response and reply, and will deny the motions.

**IT IS THEREFORE ORDERED** that Defendant Richard J. Adler's Motion to Dismiss the Indictment Based on an Improper Extradition (Clerk's Document 66), Defendant Richard J. Adler's Motion to Suppress Evidence Obtained from Illegal Search of Defendant Adler's Residence (Clerk's Document 68), Defendant Richard J. Adler's Motion for Bill of Particulars (Clerk's Document 63), and Defendant Richard J. Adler's Motion to Strike Surplusage from the Indictment (Clerk's Document 64) are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Richard J. Adler's Motion to Dismiss Counts One, Two, and Four of the Indictment (Clerk's Document 67) is **DISMISSED** to the extent it seeks dismissal of Count Four, and **DENIED** in all other respects.