**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Thomas AMBROSE, et al.,**
**Defendants-Appellants.**

**Nos. 83–1213 to 83–1221, 83–1291.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 8, 1984.
Decided July 17, 1984.

Dan K. Webb, U.S. Atty., James G. Schweitzer, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Elliot Samuels, James B. Haddad, Michael Jay Green, Chicago, Ill., for defendants-appellants.

Before WOOD and POSNER, Circuit Judges, and REYNOLDS, Chief District Judge.*

POSNER, Circuit Judge.

Ten former Chicago policemen—the "Marquette 10" as they came to be called in the course of their celebrated three-month trial—appeal from their convictions for protecting narcotics dealers in Chicago's Marquette district. The evidence, the sufficiency of which the defendants do not contest, shows that for more than three years the defendants protected two large drug distributorships in exchange for money and goods. They not only failed to arrest the distributors or their employees; they warned the distributors of impending raids by honest policemen, ignored many complaints from citizens about the activities of the distributors (who flaunted their wares so boldly that the press of customers caused traffic jams), and even beat up and threatened to kill a drug dealer who was competing with the protected distributors. The jury convicted all of the defendants of aiding and abetting federal narcotics violations, of extortion in violation of the Hobbs Act, and of violating the RICO statute. The judge sentenced each of the defendants to prison terms ranging from 10 to 20 years, followed by five years of probation.

The most difficult issue raised by these appeals is the interrelationship between the federal aiding and abetting statute, 18 U.S.C. § 2, and the so-called "kingpin" statute, 21 U.S.C. § 848 (Continuing Criminal Enterprises, Title II, § 408, of the Organized Crime Control Act of 1970), which requires that heavy penalties be imposed on a person who commits a felony narcotics violation that "is a part of a continuing series of violations . . . (A) which are under-

taken by such person [the 'kingpin'] in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and (B) from which such person obtains substantial income or resources." 21 U.S.C. § 848(b)(2). The minimum penalty for the kingpin is 10 years in prison with no possibility of parole. The maximum prison sentence is life imprisonment, again without possibility of parole. Section 848 is the only federal criminal statute that does not allow parole. See U.S. Dept. of Justice, U.S. Parole Comm'n, Rules and Procedures Manual § 2.2–04 at p. 7 (Oct. 1, 1983). And because violation can be punished by life imprisonment, neither suspension nor probation is possible even if the sentence is for a shorter term than life. This is clear from 18 U.S.C. § 3651; but to make assurance doubly sure the kingpin statute expressly forbids suspension or probation. See 21 U.S.C. § 848(c). However, time off for good behavior is allowed from other than life sentences; and for sentences of 10 or more years this enables the prisoner, by behaving himself, to cut his sentence by a third, and sometimes even more. See 18 U.S.C. §§ 4161, 4162.

■■ The defendants in this case are not the kingpins; the drug distributors whom they protected are (and in separate proceedings were sentenced to 15–year prison terms under the kingpin statute). The defendants argue that Congress, in establishing such harsh penalties for being a drug kingpin, could not have intended to subject mere aiders and abettors to equivalent penalties. No doubt this is correct, as the government concedes, with respect to those whom the kingpin organizes, supervises, or manages. Otherwise there would be no differential punishment for the kingpin. His lowliest accomplices—mixers, runners, look-outs—would be subject to the same punishment as he, since the aider and abettor statute, as we are about to see, allows the aider and abettor to be punished

---

* Hon. John W. Reynolds of the Eastern District of Wisconsin, sitting by designation.

as a principal. When a statute reveals on its face, as section 848 does, the legislators' purpose to make one class of persons punishable more heavily than another, a court will not defeat that purpose by applying the general aiding and abetting statute to the second class. Cf. *United States v. Southard*, 700 F.2d 1, 20 (1st Cir.1983). That is what we would be doing if we applied 18 U.S.C. § 2 to the kingpin's non-supervisory employees. But that is not what we are being asked to do. The defendants are not the kingpins' employees, but the kingpins' police protectors. Congress probably would have wanted *them* to be punishable, in an appropriate case, as severely as the kingpins themselves. It is difficult for a large illegal enterprise to flourish without official protection; and the large revenues that such enterprises earn (the source of the kingpin's "substantial income or resources," referred to in the statute) enable them to dangle attractive bribes before policemen and other officials. The effectiveness of the kingpin statute might therefore be reduced if a kingpin's police protectors, such as these defendants, whose efforts enabled large drug enterprises to flourish brazenly for years, could never be punished as aiders and abettors. True, they could still be punished for aiding and abetting a violation of 21 U.S.C. § 846, a statute that also carries heavy penalties. But the penalties are not nearly so heavy as those under section 848, so that under the position urged by these defendants the aider and abettor could not be punished as severely as the principal even if he was just as culpable. We do not think that Congress intended this result.

■ A harder question (not separately raised by the defendants, but implicit in their challenge to the application of the aider and abettor statute to them) is whether, in sentencing the aider and abettor of a narcotics kingpin, the judge is bound by the minimum sentence provisions of section 848. Although a minimum prison sentence of 10 years with no possibility of parole cannot be precisely equated to any sentence that allows for parole, it is approximately as severe as a 21-year sentence

with parole. A person sentenced to 10 years in prison with no possibility of parole who earned his full good-time credits under 18 U.S.C. § 4161 (but not the additional "industrial good time" credits that can be earned under section 4162) would serve 7 years, while a person sentenced to 21 years in prison would be eligible for parole after 7 years, see 18 U.S.C. § 4205(a), though he would not be assured of parole then. (Parole is never mandatory in the federal system, see 18 U.S.C. § 4206, and in fact most prisoners serve more than the one-third minimum before being paroled.) Obviously, either a minimum 10-year sentence without possibility of parole, or a minimum 21-year sentence with that possibility, takes from the trial judge a great deal of his sentencing discretion. This was Congress's desire with regard to the sentencing of the kingpin himself; but we must decide whether, in interpreting a different statute, the aiding and abetting statute, we should impute to Congress the same desire with regard to all of the kingpin's aiders and abettors.

The aiding and abetting statute states: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). Although this language, like that of its predecessor provision ("Whoever ... aids, abets, [etc.] is a principal," Act of March 4, 1909, § 332, 35 Stat. 1152), makes clear that an aider and abettor can be punished as severely as the principal, it does not make clear that he must always be punished so severely. History is against such an interpretation. The distinction between "principal" and "aider and abettor" goes back to the time when all felonies carried the same sanction—death. By enabling the courts to punish a class of less culpable offenders—aiders and abettors as distinct from principals—less severely, the distinction introduced a welcome element of gradation into the sentencing of felons. See 4 Blackstone, Commentaries on the Laws of England 39 (1769); Perkins, *Parties to Crimes*, 89 U.Pa.L.Rev. 581, 613–15

(1941). But as judges acquired more and more sentencing discretion, the need to distinguish between principals and aiders and abettors diminished, and since it was sometimes a difficult decision to make there was a movement to abolish it with regard to determining criminal liability. This movement culminated in 18 U.S.C. § 2(a). But the purpose was not to make sure that aiders and abettors were always punished as severely as principals. Indeed, in passing the statute Congress must have realized that judges would use their sentencing discretion to proportion the severity of the sentence to the aider and abettor's fault. The history suggests that, rather than being intended to limit sentencing discretion, the abolition of the distinction between principals and aiders and abettors presupposed such discretion.

Since section 848 does not prescribe all penalties but only minimum penalties, equating the punishment of a kingpin's aider and abettor to that of the kingpin would not prevent the judge from giving the aider and abettor a lighter sentence, provided that the judge was minded to sentence the kingpin to a longer term than the minimum provided in the statute. But the curtailment of sentencing discretion would still be very great, because the minimum sentences are so severe and because aider and abettor liability is defined so broadly. Learned Hand's classic definition requires only that the alleged aider and abettor "in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938); see also *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949); *United States v. Farid*, 733 F.2d 1318, 1319 (8th Cir.1984); *United States v. Beck*, 615 F.2d 441, 448–49 (7th Cir.1980). There is nothing said about the magnitude and essentiality of the aider and abettor's role. A policeman who took an isolated bribe from a kingpin but did not engage in a prolonged and systematic protection racket, as these defendants did, would still be an aider and abettor of the kingpin, and therefore under the view that the aiding and abetting statute mechanically incorporates the whole punishment schedule of section 848 would have to be sentenced to a minimum of 10 years in prison without possibility of parole. Yet if there were no minimum the judge might sentence the policeman to only two or three years in prison and the policeman would be eligible for parole after serving a third of that time.

It would be artificial to assume, in the absence of any evidence, that the Congressmen who voted for the kingpin statute in 1970 were conscious that the aiding and abetting statute (last amended in 1951) might interact with the minimum penalties in the new statute to curtail the judge's established power to differentiate in sentencing between the principal and his aiders and abettors. And to impute such a purpose to Congress would tend rather to defeat than to promote the objects of the legislation, because it would put pressure on the courts to define aiding and abetting very narrowly, as in *United States v. Jones*, 678 F.2d 102 (9th Cir.1982), in order to prevent section 848 from drawing within its deadly grasp all sorts of minor offenders. These include not only the policeman who takes one small bribe, but the landlord who leases space or the merchant who sells supplies to the kingpin knowing he is engaged in the narcotics business. These accomplices would be aiders and abettors of section 848 violations; for not being under the kingpin's direction they would not be protected by the exception to aiding and abetting liability for those whom the kingpin employs or directs.

The point is not that such accomplices ought not be punishable by such severe penalties as are provided in section 848. That is not our business. These defendants, however, were not sentenced under section 848, and could not have been, because they were not found guilty of being drug kingpins. They were sentenced under the aiding and abetting statute. Our job is to mesh two statutes passed at different times and without express reference to

each other. In attempting to mesh them we cannot ignore the Supreme Court's recent decision in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637 (1983), "hold[ing] as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted" to pass constitutional muster under the Eighth Amendment's cruel and unusual punishment clause. Although the Court in *Solem* said that reviewing courts "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crime," *id.*, where as in the present case the legislature has not spoken clearly to the interrelation between two statutes we are not merely entitled, we are required, to consider the consequences for proportional punishment of alternative interpretations of the two statutes. If we hold that an aider and abettor of a section 848 violation is within the minimum-sentence provisions of that statute, even though he is sentenced under a different statute, 18 U.S.C. § 2, we shall create a situation where the statutory scheme requires disproportionate punishment. For there will then be cases where a kingpin's own misconduct is not sufficiently egregious to earn him more than the minimum 10-year no-parole prison sentence and where the aider and abettor's culpability is much less (maybe he was just a minor supplier of the kingpin)—yet the aider and abettor would have to be given the same sentence. We do not suggest—it is not argued—that Congress would violate the Eighth Amendment if it decreed that result; it is enough that we do not think it has decreed it.

Thus, although we agree with the government that the defendants can be punished as aiders and abettors of kingpins, we must remand for resentencing on this count so that the district judge can decide whether he wants to punish them as severely as he would have to do if they were the kingpins themselves. He may decide that the sentences he has given are appropriate and reimpose them; but alternatively he may decide that less severe sentences (shorter, or with provision for parole) would be appropriate. We express no view on what sentences he should impose. Although the penalties in section 848 are among the most severe known to modern federal law, the misconduct of these defendants was very grave, and we do not depreciate it. They were not, however, the kingpins; and we hold that in sentencing an aider and abettor the district judge is not bound by the minimum-sentence provisions in the kingpin statute. On remand he should indicate explicitly whether the sentences he imposes shall be subject to parole. We also accept the government's confession of error with regard to the district judge's action in sentencing the defendants both for aiding and abetting violations of 21 U.S.C. § 848 and for aiding and abetting violations of 21 U.S.C. § 846; section 846 is a lesser included offense of section 848. *United States v. Jefferson*, 714 F.2d 689, 705 (7th Cir.1983).

We move now to the defendants' complaint that remarks made by the prosecutor (Mr. Webb, the United States Attorney) in closing argument regarding the possible consequences for the defendants if they were convicted of aiding and abetting a violation of the kingpin statute were misleading. During the course of the trial, for reasons of which the defendants do not complain, the prosecution had told the jury that the kingpin statute carried heavy mandatory minimum prison terms; and thereafter the defendants' lawyer kept emphasizing this point to the jury in order to make the jury reluctant to convict. In closing argument, Webb, after telling the jury that the defendants were charged with aiding and abetting violations of the kingpin statute, added: "just so there's no confusion, this is not a life and death struggle.... [T]o the extent that these lawyers try to tell you that the consequences—for example, his liberty is at stake—that's just not true. I mean, if there is going to be punishment imposed, he [the district judge] will do that. But that's not in issue." If what Mr. Webb had meant, or had been

understood to say, was that the defendants could not be sentenced to prison if they were convicted, this would have been a serious misstatement and might have required a curative instruction (which was not given) to avoid reversible error. Although sentencing is not the jury's business, and in the normal course the jury is not even told what the range of possible sentences is, jurors have some sense of what are grave crimes, likely to be punishable by substantial prison sentences; and to be misinformed that what they thought was a serious crime was not punishable by imprisonment could lead them to resolve any reasonable doubts as to guilt against instead of in favor of the defendants. But the words "his liberty is [not] at stake" must not be read in isolation from the explanatory sentence that followed. When both sentences are read together, it seems that what Webb probably meant was that the jury wasn't supposed to consider what the consequences of conviction might be for the defendants; that was the judge's business. At least that is a possible reading; and though one would have had to hear the inflection with which Webb spoke to be sure what he meant, any doubt on that score must be resolved against the defendants. The able and experienced district judge had a big advantage over us, in actually hearing the words; and the gravity of the offenses with which the defendants were charged persuades us that he would have intervened if, as spoken, these words had conveyed the false impression that the defendants would not be punished with a loss of liberty if they were convicted.

We must also be wary of highlighting a few seconds in a trial that lasted three months. The jury had heard a great deal about the harsh minimum sentences for violators of federal narcotics laws; and while it is true that the prosecutor prefaced his comment about "liberty" with the remark that the defendants were being charged with aiding and abetting, we doubt that a jury would have inferred that the defendants were being charged with a minor crime. The entire emphasis of the prosecution was on the gravity of the defendants' crimes as devoted protectors of large-scale drug racketeers; we do not think the word "liberty" was likely to have dispelled that impression.

■ The defendants were also convicted of extortion under the Hobbs Act, 18 U.S.C. § 1951, and of violating RICO (Racketeer Influenced and Corrupt Organizations, Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961–1968). The Hobbs Act makes "whoever in any way or degree obstructs, delays, or affects [interstate] commerce or the movement of any article or commodity in [interstate] commerce" guilty of a crime. 18 U.S.C. § 1951(a); see 18 U.S.C. § 1951(b)(3). The defendants argue that the interstate commerce affected must be legal. Some legal interstate commerce *was* affected by the defendants' extorting money from the drug dealers whom they protected—commerce in the quinine and other substances that are mixed with heroin and cocaine in preparing them for sale to the consumer. It is immaterial that the amount of commerce affected was small, either absolutely or relatively; $68 a month was held to be enough in *United States v. Boulahanis*, 677 F.2d 586, 589–90 (7th Cir. 1982), and the amount here was a lot more. The difference between this case and *Boulahanis*, however, is that here the lawful commerce was incidental to an unlawful activity, the sale of illegal narcotics; and it can be argued that anything that obstructs that commerce discourages the unlawful activity and is therefore a good thing. Moreover, most of the commerce affected by the defendants' extortionate activity was itself illegal commerce, in narcotics; and again it can be argued that to burden an illegal interstate business is to promote the ultimate objectives of the Hobbs Act. Yet *United States v. Hanigan*, 681 F.2d 1127, 1131 (9th Cir.1982), held that the Hobbs Act does not require that the interstate commerce affected by a defendant's extortionate activity be legal.

■ We think this holding is correct, at least in a case such as the present where the sums extorted are for protecting an illegal activity. Although the drug dealers paid the defendants substantial sums that, considered in isolation, increased the dealers' costs of doing business, the dealers got in return something invaluable to them— police protection that enabled them to conduct their businesses on a far larger and presumably more profitable scale than would have been possible if they had lacked such assistance. The benefits to the illegal activity exceeded the costs, so that on balance the activity was promoted rather than retarded. The issue is therefore whether the Hobbs Act can reasonably be read to punish extortion that promotes illegal commerce as well as extortion that retards legal commerce. Although discouraging the latter type of extortion has been said to be the dominant purpose of the Act, see, e.g., *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960); *United States v. Mattson*, 671 F.2d 1020, 1023 (7th Cir.1982), discouraging the former is a complementary objective and one well within the Act's language. Moreover, it would be unrealistic to suppose that all Congress cared about in passing the Hobbs Act was promoting trade among the states; common sense, with a little support in legislative history, suggests that interstate commerce was not merely the object of Congress's solicitude but also a handle for enabling federal power to be brought to bear on criminal activities that, because of their multistate incidence, the states had difficulty controlling. See 91 Cong. Rec. 11909–10 (1945) (remarks of Chairman of House Judiciary Committee); cf. H.R.Rep. No. 1833, 73d Cong., 2d Sess. 2 (1934) (letter from Attorney General, concerning bill that became the Anti-Racketeering Act, the predecessor to the Hobbs Act). The extortion in this case is within the scope of intended prohibition.

■ The relevant provision of RICO, 18 U.S.C. § 1962(c), makes it "unlawful for any person employed by or associated with any enterprise ... to conduct ... such enterprise's affairs through a pattern of racketeering activity ...." The enterprise here is the Chicago Police Department (though it could just as well be the kingpins' businesses); and the defendants argue that they cannot be guilty under this section because the "enterprise" did not benefit and because the defendants did not have a supervisory position in it. Both arguments were rejected in *United States v. Kovic*, 684 F.2d 512, 516–17 (7th Cir. 1982), another case of a corrupt Chicago policeman. To take over a legitimate enterprise and loot it through criminal activity that the statute defines as a pattern of racketeering is one of the forms of misconduct punishable under section 1962(c), see *Sutliff, Inc. v. Donovan Cos.*, 727 F.2d 648, 653 (7th Cir.1984), and to use one's position in the enterprise to line one's pocket through a pattern of racketeering activity is so closely related as to be indistinguishable.

■ The defendants challenge their convictions on a number of other grounds besides those we have discussed, but the additional grounds have no possible merit and can thus be disposed of very briefly. There are complaints for example about the use, to impeach defendant Lowery, of a statement that he had given the FBI before trial. The defendants argue that the statement was within the scope of the request that they made before trial for the government's evidence of guilt. But it was not used as evidence of guilt; it was used only for impeachment. The defendants (other than Lowery himself) argue that they should have been allowed to sever their trials from his, because the statement so damaged his credibility. But the fact that one codefendant may be less credible than another is not a ground for severance. They also argue that the statement implicated them (as it did, for in it Lowery said that he had seen some of the defendants taking money from drug dealers), as well as casting doubt on Lowery's credibility, and thus that their right of confrontation was infringed since it was an out-of-court statement. But Lowery was there in court, available for cross-examination; thus, to

the extent he was an adverse witness, they could confront him.

■ Defendant DeSimone, the only defendant who was not a member of the Tenth District Tactical Unit, argues that his trial should have been severed because he was less culpable than the other defendants. It is true that his involvement in the protection activities was less extensive than that of the other defendants, as he was not assigned full time to the Marquette district where the drug dealers had their operations. But the evidence of his guilt was clear, and it is most unlikely that the jury would have acquitted him had he been tried separately; but the cost of a separate trial would have been substantial. Cf. *United States v. Shively*, 715 F.2d 260, 267 (7th Cir.1983).

■ There is no merit to the argument that a new trial should have been granted because of newly discovered evidence consisting of proffered testimony of inmates that prosecution witnesses with whom they shared cells had admitted that they had lied in testifying for the government. The district judge conducted a hearing and satisfied himself that it was the newly discovered "evidence" that was false, not the evidence at trial. This was a perfectly reasonable conclusion, especially considering the source of the evidence. And "it [is] important for the orderly administration of criminal justice that findings on conflicting evidence by trial courts on motions for new trial based on newly discovered evidence remain undisturbed except for most extraordinary circumstances," *United States v. Johnson*, 327 U.S. 106, 111, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946).

The district judge's handling of the prejudiced-juror and pretrial-publicity issues was scrupulous, and entirely in accord with the applicable precedents. See, e.g., *United States v. Wilson*, 715 F.2d 1164, 1169 (7th Cir.1983); *United States v. Read*, 658

F.2d 1225, 1241 (7th Cir.1981). No other issues need be discussed. To summarize, the defendants' convictions under 21 U.S.C. § 846 are vacated, their other convictions are affirmed, and the case is remanded for resentencing on all counts. See *United States v. Harris*, 729 F.2d 441, 449 (7th Cir.1984); *United States v. Shively, supra*, 715 F.2d at 269.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

HARLINGTON WOOD, Jr., Circuit Judge, concurring in part and dissenting in part.

Judge Posner, writing for the majority, upholds the defendants' convictions as aiders and abettors [1] of a continuing criminal enterprise.[2] With this much I am in complete agreement. But Judge Posner then vacates the sentences imposed and gives the district judge sentencing discretion which the statute withholds. To that extent only, I respectfully dissent.

In my view the majority has created a sentencing problem where there was none, and then has rewritten the statute to solve the problem. The "problem" has to do with the relationship between the aiding and abetting statute and the continuing criminal enterprise penalty provisions.

The punishing of an aider and abettor as a principal is a long-recognized concept of our criminal law. The aiding and abetting statute is applicable to the entire criminal code. *United States v. Jones*, 678 F.2d 102, 105 (9th Cir.1982).[3] It does not define a separate offense. *Londono-Gomez v. Immigration & Naturalization Service*, 699 F.2d 475, 476 (9th Cir.1983). It says in plain language that an aider and abettor is punishable as a principal. "[T]hose words mean what they say." *Busic v. United States*, 446 U.S. 398, 411 n. 18, 100 S.Ct. 1747, 1755 n. 18, 64 L.Ed.2d 381 (1980); *see also Standefer v. United States*, 447 U.S.

1. 18 U.S.C. § 2(a) (1982).

2. 21 U.S.C. § 848 (1982).

3. For exceptions to its general application not relevant to this case, *see United States v. Southard*, 700 F.2d 1, 19–20 (1st Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 89, 78 L.Ed.2d 97 (1984).

10, 18–19, 100 S.Ct. 1999, 2005–2006, 64 L.Ed.2d 689 (1980).

Yet the majority instructs the district judge that he may ignore the statute under which the principal would be sentenced, which here specifically provides for a minimum sentence and contains a prohibition against probation and parole. The district judge's discretion may be exercised unfettered by the statute if the judge considers some other sentence preferable to what Congress has provided. That amazing disregard for the statute creates an interesting precedent for future cases. It seems to be based on the speculative assumption that Congress, although aided by its judiciary committees, did not really understand what it was doing. If Blackstone, cited by the majority, could somehow have had the chance to familiarize himself with the subsequent development of our criminal laws and precedents, then I would, of course, give great weight to his views. However, what is being done here, without the benefit of any supporting legislative history, cannot fairly be labeled as historical or statutory interpretation. The only appropriate way to accomplish what the majority has done is for Congress, if it changes its mind, to amend the statute. In the meantime, I decline to join as a sponsor of this judicial statutory amendment proposed and passed by the majority with this opinion.

This court recently reaffirmed the components of aiding and abetting as earlier enunciated by Judge Hand:[4]

> *first,* the aider and abettor must be associated with the criminal venture;
>
> *second,* the aider and abettor must participate in the criminal venture as something he wishes to bring about; and
>
> *third,* the aider and abettor by his actions must try to make the criminal venture succeed.

*United States v. Galiffa,* 734 F.2d 306 (7th Cir.1984). These are distinct and meaningful elements, each of which must be satisfied in the particular circumstances of the case before a defendant may be convicted as an aider and abettor. If a defendant intentionally does these three things, the statute makes him punishable as a principal, and he deserves to be. The majority opinion, however, refers to *"mere* aiders and abettors," *supra* at 507, and to the aider and abettor elements as being *"only"* what is required, *supra* at 509 (emphasis added). I would not so deprecate the seriousness of the aider and abettor's role.

But if there be any merit to the view that aiders and abettors may not be quite as culpable as genuine principals,[5] this is not the case to try to fashion some exception. These former police officers gained money, weapons, and other things of value by associating themselves with a continuing narcotics supermarket. They participated in it, and wanted and tried over a period of time to make it succeed. They earned their rewards by, for instance, warning of impending raids by honest officers. They delivered to their criminal associates narcotics seized from competitors. They even recruited for their criminal associates the customers of competitors in the narcotics business. They had the power to shut the enterprise down and dethrone the managers, but did not do so. These defendants contributed to the success of the entire criminal enterprise on a continuing basis. This is not a case of a police officer taking one bribe, or a merchant selling supplies to the enterprise. Such isolated transactions without more would not necessarily meet the aiding and abetting test as applicable to a continuing criminal enterprise. We need not, however, for this one case write an opinion for all seasons, as the law will develop in its own time.

All through this part of the majority opinion there is a refrain about the harsh and severe sentences. But an increased sentence is exactly what Congress intended. It was the expressed intent of Con-

---

4. *See United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938).

5. *Cf. Standefer v. United States,* 447 U.S. 10, 19–20, 100 S.Ct. 1999, 2005–2006, 64 L.Ed.2d 689 (1980) (aider and abettor may be convicted despite prior acquittal of principal).

gress that the penalties it provided "serve as a strong deterrent" and keep "those found guilty of violations out of circulation." [6] Although I generally have serious reservations about mandatory minimum sentencing statutes, I am not greatly moved in this case by the length of the sentences imposed. Were I still on the district court faced with the responsibility of sentencing these defendants, I would, I believe, consider the sentencing discretion given me under the statute to be sufficient. It was these former police officers, not the kingpins, who not only violated the federal statutes but dishonored their profession and betrayed the public trust.

I fail to see the relevance of *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), cited by the majority. The Court held in *Solem* that the sentence imposed was disproportionate to the crime committed and therefore unconstitutional. But it was a sentence of life imprisonment without possibility of parole imposed upon a defendant with a relatively minor prior record for uttering a "no account" check for $100. The sentences in our case, though arguably strict, are certainly not so disproportionate to the crime involved that they amount to cruel and unusual punishment under the eighth amendment. One who meets the aiding and abetting test as applied to a continuing criminal enterprise will be much more than a minor offender and as deserving of punishment as the kingpins. While we do not broadly state that *Solem* may not apply in some future case, we cannot allow that remote possibility to force us down a different path in this case.

I expect that some district judges may hesitate to use Judge Posner's newly created judicial invitation to wander outside the statute. Considering the serious view taken by Congress of the present narcotics scourge in this country, which has gotten to be a big business, the sentencing judge has all the discretion needed under the continuing criminal enterprise penalty provision. That statutory discretion permits sentences from ten years to life, with a fine of not more than $100,000 as well as forfeiture.[7] If a defendant does not meet each of the criteria for being an aider and abettor as applied to a continuing criminal enterprise, that is, if he has not in fact associated himself with the criminal enterprise, participated in it, wished its success, and worked to make it succeed, then a judgment of acquittal should be entered.

At the hearing on January 18, 1983, Judge Grady, in sentencing these defendants, did not lament that the statute was forcing him against his conscience to impose undeserved severe sentences on these defendants, although he clearly recognized what the law required. Quite to the contrary, Judge Grady noted that the government had offered to dismiss these aiding and abetting counts requiring the ten year minimum, and all but one defendant declined that offer. The offer was declined, as the judge pointed out, because the defendants endeavored to turn the minimum sentence to their tactical advantage during trial. It was hoped that knowledge of the minimum sentence of ten years might help persuade the jury to find the defendants not guilty. Their ploy failed in the trial court. Judge Grady also distinguished the sentencing in a prior police criminal case on the basis that in that case it was one specific act on a specific day in one specific place, whereas the defendants in this case were engaged in a lengthy course of conduct. Judge Grady's view of the case may be summed up in his comment at the hearing, "and I am prompted to say that these crimes that were committed in this case come about as close to unmitigated evil as anything I have encountered in my lifetime." On some of these defendants, Judge Grady imposed greater sentences than the statute's minimum. But rather than take any of Judge Grady's sentencing

---

6. H.R.Rep. No. 91–1444, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 4566, 4575–76.

7. For a second conviction under this section, the minimum goes up to 20 years and the possible fine to $200,000. 21 U.S.C. § 848(a) (1982).

remarks out of context, I am attaching as an appendix to this dissent the full text of his remarks, except for the actual sentence pronouncements. His thoughtful remarks not only illuminate the particular circumstances but may have use and meaning beyond this case.

We of course cannot permit prosecutors to abuse this statute by charging as aiders and abettors those who had only isolated contacts with a continuing criminal enterprise. But such charges against a one-time bribe-taker or supplier would fail for lack of proof. There are no doubt other crimes with which peripheral but deserving defendants may be charged.

It is one thing if a defendant chooses to aid and abet, for instance, the crime of hunting migratory birds over a baited area, see *United States v. Swann*, 377 F.Supp. 1305 (D.Md.1974), a petty offense carrying a maximum of six months imprisonment. However, if a defendant has greater criminal ambitions and prefers to associate himself with professionals in a continuing criminal enterprise, something he expects to be more economically rewarding, then that defendant should be prepared to pay the price that Congress has set for engaging in a continuing criminal venture.

I would affirm the district court in all respects.

### APPENDIX

### REMARKS OF JUDGE GRADY AT SENTENCING HEARING ON JANUARY 18, 1983

[115] * [THE COURT:] I would like to begin by commenting on what appear to be the mitigating factors in this case. Specifically, the mitigating factors are the good things that these defendants have done in their lives prior to, contemporaneously with, and undoubtedly subsequent to the misdeeds which have brought them here today. Each of the defendants has rendered worthwhile service to his community.

Each of them has been a good family man. Even the defendant who is not married is a devoted son to his parents. Many of these defendants have served honorably in the military, and their service as police officers was marked by many commendable activities. Each of them has received many commendations of one kind and another for good police work.

I am struck by the number of commendations, and as one of the probation officers pointed out in the presentence investigation, most of these commendations are given for routine work well done. To some extent, the picture is misleading when one talks about 500 honorable mentions in a career of 10 years. That is one a week, and [116] no matter how hard each of us works at our job, very few of us render exemplary service on the average of once a week for service so outstanding as to warrant an honorable mention.

It is in the nature, however, of police work that a policeman is constantly confronted with opportunities to render worthwhile service to another person in need. Emergencies are a way of life with policemen. Consequently, doing things that for the rest of us would be unthinkable become by virtue of the policemen's very job duties routine. So while I do not wish to demean the significance or lessen the significance of the fine work these men have done, my impression is that their police records do not set them apart from most other policemen in the City of Chicago insofar as performing their duties in a competent manner.

Having said that, I run out of mitigating factors. As each of the probation officers mentioned in his or her presentence report, this case is literally without redeeming or extenuating circumstances as far as the offenses themselves are concerned. In most crimes, one can look, and if one looks hard enough and with enough understanding and compassion, one can find an excuse for what the defendant has done.

---

* Numbers in brackets signify the page of the transcript where the material following the

number can be located.

The defendant may have been emotionally disturbed. The defendant may have been laboring [117] under some temporary, economic, family, or other exigency which caused him or her to commit the crime. Most people commit most crimes because of economic need. These defendants did not commit these crimes because of economic need. Policemen are not overpaid, but each of these defendants was making in the neighborhood of $25,000 a year as a policeman, and they were supplementing their income with part-time jobs, and their income was well above the national average. So these crimes were not committed because of economic need nor for any other reason that could conceivably be an excuse for what was done.

This is reflected in the fact that no excuse is offered either by the defendants themselves or by their counsel. The defendants deny that they did it. Their counsel in argument yesterday frequently spoke as though they were representing innocent persons, persons who had been unfairly convicted. The reason for this is clear. The reason for this is that there is nothing to be said on behalf of these men for the crimes of which they are convicted. The only way one can sympathize with these defendants is to conclude that they are innocent and wrongly convicted as the defense argued to the jury in final argument.

They were charged with the worst crimes there are, the worst possible crimes. What could be worse [118] than for a policeman to take money from a heroin peddler and to do it not once or twice or 10 times but scores of times over a period of years? So we all recognize what it is we are dealing with, and the defendants have chosen to deal with it by denial, both before and after the verdict.

[119] I sympathize with their counsel who labored yesterday under about the most disadvantageous circumstances I have ever seen in a courtroom, as far as advocacy is concerned.

There was reference to another factor which I do not regard as [a] mitigating circumstance. I regard it as an unfortunate consequence of these convictions and an unfortunate consequence of the acts that the defendants committed, and I refer to the terrible and devastating effect of this case upon the families of these defendants. I am aware, believe me I am aware of what this means to these families and to these children. Shortly after the verdict I received letters from three small children, "Please don't send my daddy to jail."

One cannot help but feel an enormous sadness at what this case has done and will do to the innocent children and wives and parents of these defendants. But there are 13,000 policemen out there in the [C]ity of Chicago. They all have families. Many of them, if not most of them, have small children. And if the court were to excuse the conduct of these defendants on the basis that they have families and they have small children, it is difficult to imagine how we could expect the other policemen, who are subject to [120] the same temptations and the same opportunities and the same stresses that these defendants were subject to, to take seriously the threat of criminal prosecution should they violate their oath.

And therefore, while the plight of the families works its way into this sentence today, because it is part of my consciousness, it cannot control. It cannot control, otherwise we will have to close the doors of this courthouse and say to the people of this community that we are powerless to deal with crimes committed by policemen, or indeed any other criminals who have families and small children dependent upon them.

[121] I have sometimes thought in the time I have been on the bench that there must be some unwritten rule that only people with small children and sick wives and other people dependent upon them are allowed to commit crimes, because that seems to be the only people we have come here. That is something of an exaggeration, but there is more truth to it than exaggeration.

We are dealing here with a ten-year minimum sentence. The defendants have invit-

ed me to disregard that provision of the law. I decline that invitation. I have interpreted the law to apply to this situation, and it is clear to me that if it does apply, the ten-year minimum mandated by our elected representatives, my oath of office requires me to apply that law.

It is interesting that the defendants used the ten-year minimum to what they thought was their advantage during the trial. The government was understandably concerned that the jury might simply decline to convict if it knew that these men were facing a ten-year minimum sentence, and the government offered to dismiss those counts of indictment which called for that minimum. The defendants declined that offer and insisted that the case go to the jury with the ten-year minimum count included.

MR. HADDAD: Judge, most respectfully, there was none from defendant Eatman, who was willing to take that [122] offer. I wish the record to so reflect that.

THE COURT: All right, it may so reflect. You recall we had a sidebar, and I asked for the names of those that took that view, and there may have been some, as you say, who were not included. But my recollection is that most of the defendants made this strategic decision, and it is not a decision with which I argue, nor one which I second-guess at this point.

The jury was informed repeatedly during final argument that this was a ten-year minimum offense. The jury had a very hard time convicting these defendants. I know that to be the truth. They wrestled with the same considerations that we are discussing here today. The families were prominent in the audience throughout the trial. The children were prominent. And the jury knew by virtue of having been repeatedly informed that this was a ten-year minimum.

And one of the things which lessens the burden I feel today is my absolute conviction that this jury of twelve intelligent citizens had no reasonable doubt whatsoever of the guilt of any one of these defendants on any one of the counts on which they were convicted. This jury returned its verdict in tears, as those of you who were here that day will recall. And I saw the jury after they left the courtroom, and there was not a dry eye among [123] the twelve.

The jury did its job, even though it was a difficult one. They did what they believed they had to do in light of the evidence. And the least I can do is to keep faith with them and do my job by applying the law as I believe it to be.

I would next like to discuss those factors which I believe argue against leniency. There are two overall considerations. One is the fact that these defendants violated so flagrantly and repeatedly the trust that had been reposed in them by the citizens of this community.

The other general consideration is the nature of the business these defendants protected by their breach of trust.

I won't say anything about the narcotics problem today, because it has all been said by the defendants' attorneys in their final arguments to the jury, when they excoriated the government witnesses for being dope peddlers and called the attention of the jury to what heroin does to the people who use it and the social problems it causes.

[124] I recall the cross-examination of some of the government witnesses on the subject of whether they knew that some of the people who were buying dope from them were children or that some of the people who would be using the heroin they were peddling would be children and, of course, one is prompted to ask the same question about these defendants: Did they know and did they care that the businesses they were protecting were peddling heroin to anyone who would buy, peddling heroin which could be used by anyone who chose to use it including children?

It is bad enough when the traffic policeman violates his trust by shaking down a motorist who is going three or four miles over the speed limit. None of us approves of that kind of conduct, but the breach of trust of a policeman who takes money from

a heroin peddler to allow the heroin peddler to operate seems to me to be doing something which is different in kind, not simply in degree, from the policeman who takes money for permitting or excusing less grievous transgressions against society.

Aside from those two major considerations, there are subsidiary factors which seem to me to be important, and most of them were adverted to by Mr. Webb in his remarks yesterday. The duration of these courses [125] of conduct on the part of these defendants was long. We are talking about years that these drug rings were allowed to operate. Not all of the defendants were on board for the whole trip, to be sure. Some of them were. But the least involved of these defendants was engaged in a lengthy course of conduct.

The case of Berry and Blakey was referred to by counsel in argument yesterday. That was a case involving two policemen convicted in this courtroom some five years ago, and a comparison was suggested. The comparison is not apt. Berry and Blakey were engaged in one specific act of extortion on one specific day in one specific place. The amount of money they realized from it was relatively small, and at that, they received sentences, I believe, of seven or eight years.

The notoriety of what the defendants did is another aggravating circumstance, it seems to me. The activities of these drug rings were known in the communities on the south side in which they took place. They were known to other policemen. They were known to the superiors of these defendants. Everyone who knew anything about it and who had any interest whatever in a law-abiding society had to be scandalized by what took place.

The children in these neighborhoods who knew [126] that the police charged with enforcing the law were instead taking money from heroin peddlers have, I think, probably experienced disillusionment which will be lasting and irreparable. This could not have gone on without the cooperation of the police.

During the trial, the defendants made much of the difficulty of obtaining evidence against these drug traffickers and of bringing cases in court successfully so that they would be convicted, and it seemed to me that all of that was beside the point. As was emphasized throughout the trial, these were tactical officers whose job was to come in, make things happen, harass criminals, hassle them, as the term was used during the trial. And it would have been very simple using those tactics for these defendants, had they wished to do so, to put these drug rings out of business within a matter of days.

[127] I said at one time out of the presence of the jury during the trial that the way that would be done would be simply to arrest the people who came there to buy the drugs. Everyone knew and could see that the vehicles which arrived there were engaging in drug transactions. When those vehicles left, there was certainly probable cause for the officers to believe that the driver and occupant of these vehicles were in possession of narcotics. That was probable cause for the arrest of the persons in the car, and that arrest could easily have been made, and a search of the vehicle would have revealed narcotics which could have been seized, and the vehicle itself could have been seized because a vehicle which is used to transport narcotics is forfeitable both under State and Federal law.

How long would C.W. Wilson have been able to operate with his curb service heroin business when word got out that the best way to lose your car was to drive it down there and buy some heroin? How long would Kelly and Smith have operated when it became known that if you go down there and give them the hundred dollars for some heroin, you are going to lose your hundred dollars and the heroin because the police are going to confiscate the heroin just as soon as you drive out of that dead[ ]end street?

How long would they have operated? [128] Not very long, not very long; a matter of days. These policemen knew that.

Any person with common sense knows that, and the superior officers of these defendants knew that. The men who came in here and testified with their brass buttons and their braid, they knew that, both when they testified and while this was all going on. So all of the wringing of hands and sniveling that went on during the trial about the difficulty of obtaining convictions of these people was, in my view, totally irrelevant.

Then, of course, we found out that when honest police officers arrived and devoted themselves to the project, it was possible, not simply to harass the buyers and put the operations out of business, but, indeed, to arrest and convict the operators of these rings and to send them to jail for very long periods of time.

The amount of narcotics sold here is simply inconceivable unless you sat here as we all did month after month and listened to the actual facts of what took place. $10,000 a day; there has never been anything like that before any Court that I am aware of. I think Mr. Webb is probably right. This case is unique, if not in the scope of the corruption, at least in the scope of the operation that was involved, its continuity, its visibility, and the volume of drugs that were sold, and, therefore, the amount of human destruction that was wrought day after [129] day, year after year, all with the toleration of these defendants and others.

A way of summing up one's reaction to these aggravating features of this case is, I think, simply to refer to the enormity of the crime. It staggers the imagination to contemplate what took place here. The defendants had a trial in which the prosecution had to literally swim upstream the whole way against the disbelief with which one approaches the likelihood of all this being true. It cannot be true, can it? It cannot be true that 10 police officers would do what these men have done, and, yet, a jury of 12 good citizens came reluctantly and fairly to the conclusion that, indeed, it had happened.

There [was] much discussion yesterday about whether these are evil men. It is not for me to say whether they are evil or not. It would be presumptuous of me to comment on what lies in their hearts and in their minds, but it is not presumptuous, I think, for me to say that what they did was evil. And it really makes no difference whether they are evil because what I am concerned with here is the crime that was committed.

I am reminded of a phrase that I think Mr. Werksman used during final argument that I thought was very good. No, excuse me. It was Mr. Bailey who referred, I think, to Allen Clay as being about as close to unmitigated [130] evil as anyone can come, and I am prompted to say that these crimes that were committed in this case come about as close to unmitigated evil as anything I have encountered in my lifetime. [131] What is the purpose of a sentence in this or any other case? I agree with Mr. Werksman's statement that a sentence has three purposes or at least that has traditionally been said to have three purposes: First, punishment of the particular offender; second, rehabilitation of that offender; and, thirdly, deterrence of other persons from committing similar crimes.

Mr. Werksman argues that we are in a no/win situation here. He says that these men have been punished enough; so there is no point in punishment. He said they do not need rehabilitation since they are all hardworking, devoted family men and are unlikely to commit this offense again. Finally, he says that punishment does not deter, and, therefore, the objective of deterrence is irrelevant.

If that were true, we would literally be faced with a situation which had no remedy. I disagree with part of that analysis. Usually, punishment is not a salutory thing. I think most judges rarely impose a sentence for the purpose of punishing someone in the sense of getting even or taking revenge. That is counterproductive and usually pointless.

In this case, however, I am not so sure. Society has been injured here. It has been injured in a way that is incalculable. It

trusted these defendants [132] and relied upon them to do a job, and the defendants did not do the job, and the things that they did instead are almost unspeakable. In response to that injury, I believe that society has a right to strike back. In this limited kind of situation, the majesty of the law requires some vindication. The people have to know that there is a way that their anguish and their disillusionment and their shock and what has occurred here can find expression. And to that extent, I think that punishment is a relevant purpose. It is by no means the primary purpose.

I will get to the primary purpose in a moment after I express my agreement with Mr. Werksman that rehabilitation is irrelevant here. These defendants will never again serve as police officers. It is unlikely that they will ever again have an opportunity to violate the public trust. Whether they engage in other kinds of criminal conduct again will not be a function of the length of their sentence in this case; it will be a function of their own decision as to how they are going to lead the rest of their lives. That is up to them; it is not up to me, and will not be affected by what we do here today.

[133] The matter of deterrence is something, I believe, that is extremely important in this case. Indeed, it is the consideration which forms the basis of the sentence I am going to impose. It is true that prison does not deter other people from committing crimes in many kinds of situations. I agree with Mr. Werksman that in many situations people do not take into account the possible consequences before they act. It does not make any sense to say that a sentence imposed upon A is going to have anything to do with whether or not B five or ten years later decides to violate that same law. Crimes of passion would be an example. Crimes motivated by extreme economic need are another example. Crimes motivated by a need for the kind of thing these defendants were helping to sell, the need for heroin, cannot be deterred by a fear of incarceration. But there are other kinds of crimes which can be deterred by a fear of punishment, and those are the kinds

of crimes which are the result of calculation. They are crimes committed by gamblers; that is to say, people who weigh the probabilities, weigh the benefits of committing the crime against the possibility of punishment, and arrive at a decision as to whether it is worth the gamble. That is the kind of crime that can be deterred. That is the kind of crime which the Courts have a significant role in preventing. What are we dealing with here? The [134] group of persons whom we wish to deter consists of a highly sophisticated group of people who are intimately informed about what goes on in cases of this kind.

Another problem with general deterrence, of course, is how do you know that what you do in this case will even come to the attention of probable violators in the future. The usual answer to that is that everything the Court does becomes part of the general experience of mankind, and, therefore, in an indirect way enters into the consciousness of the people. But in this case, we do not have an indirect kind of message that will be sent. The message will be very direct. Of the 13,000 Chicago policemen, not a one of them will be unaware tomorrow morning of what happened here today.

Now, what happened in this case is that these defendants weighed the odds and concluded that the odds were very much in favor of doing what they did. They had two things going for them, two propositions. The first proposition is that these policemen never turn each other in, the code of silence. And, in fact, it is not simply a code of silence; it is a code of mutual cooperation. Not only will policemen not testify against each other, but they come to the assistance of a fellow officer who gets in trouble.

[135] I don't mean to say that there isn't such a thing as a policeman, or some policemen who will testify against others, but it is a fact, and it was even admitted here from the witness stand, that there is a code of silence, and that most policemen observe it. Those policemen who testify against

others are usually in the intelligence units, and that's their very job, to attain evidence of illegal activity by other policemen, and I get the general impression that the policemen who are members of such units are not the most popular members of the force.

But in any case, that was the first proposition, and it proved well founded in this case, and who knows how long it will continue to be an axiom. I saw nothing in this case to lead [me to] believe that that assumption will not continue to be a safe one.

Proposition number two. No jury would believe a dope peddler. That's the one that went down the tube in this case, in a way that no one would have believed, and what the defendants didn't take account of is that the proposition is true, but it doesn't go far enough, or rather, it goes too far.

The proposition that in a one-on-one situation, dope peddler against police officer, the dope peddler doesn't have a chance of being believed, [136] that is true. That you can put in the bank.

But what the proposition doesn't take account of is the possibility of what happened here, not just one, two, three, not just ten, not just fifteen, how about thirty, how about fifty witnesses testifying to facts which proved beyond any doubt that this particular police officer did these particular things.

And, of course, the most telling evidence in this case, in my view, and it was evidence that was never explained, was the evidence of the bank tellers, who testified to the possession of amounts of money by these defendants that corroborated in a very significant way the testimony of the dope peddlers.

So it may be that this case represents the beginning of a new day, a day when police officers who desire to commit crimes can no longer rest assured that their word will be taken as gospel as against the word of prosecution witnesses. If there are enough prosecution witnesses, it is reasonable for the prosecution to expect to win a case of this kind.

Now, the amount of money that has to go into an investigation and prosecution of this kind is enormous, and the prospective violators may be fairly confident that in his particular district or on his particular street or his particular beat nobody is going [137] to spend millions of dollars that probably went into the prosecution of these rings and these ten policemen. And unfortunately, he's probably right. We don't have enough resources to devote the Marquette 10 kind of effort to check out every suspicion that might exist as to police dishonesty.

So the people we would like to deter by this sentence still have pretty good odds, if they are the kind of people who take the gamble.

Implicit, of course, in what I have said is that we are dealing with people who have no moral compunction about doing the kind of thing that was done here. One hopes that this represents a small minority of the police force. One hopes that most policemen, indeed most public servants, do their jobs and do them honestly, not because they are afraid of being prosecuted, not because they believe their word will be taken over the word of criminals who might turn them in, but rather because they believe that that is the proper way to do their jobs. Basically they are just honest people. They don't need the fear of prosecution to keep them from committing acts of dishonesty.

[138] But for those who do need that kind of threat as a deterrent, the length of the sentence as one element of the deterrent has to be viewed, in light of difficulties the prosecution faces in successfully prosecuting cases of this kind. If, in addition to those difficulties, what can be anticipated at the end of the line is a lenient sentence, the odds are greatly affected. If someone who is contemplating crimes of this kind knows that the likelihood of his conviction is slight, and if convicted, that the likelihood of a substantial sentence is also slight, then the enormous rewards that can be reaped by a dishonest policeman in that and other kinds of illegal activity might

well be perceived to outweigh the possibility of any punishment, and the gambler who plays the odds will not be deterred.

This is why I believe that the sentences in this case must be substantial. Their only function is to make the gamble unattractive, to make the gamble, whatever the odds may seem to be, unattractive.

I would like to consider two defense arguments that were made during the trial, and again yesterday. It is not clear to me in what connection these arguments are relevant, but they have been made, and I would like to deal with them.

One is the argument that it doesn't do [139] any good anyway. If you close down Avers Avenue, they will open up someplace else, and if you put C.W. Wilson in jail, somebody else will come along to take his spot. They are waiting in line.

That is a legislative decision that could be made by the legislature if it is ultimately determined that the battle against drug abuse is a hopeless one. So far, the legislature of the State of Illinois and the Congress of the United States have adhered to precisely the opposite view. We have not decided to give up in the efforts to, if not eradicate, at least to lessen to the extent humanly possible the horrors of the drug problem. And the very ten-year minimum sentence that is the cause of concern here is an illustration of the deep commitment of the elected representatives of the people of this country to the idea that we can and should do something.

If these defendants had desired to cause the Chicago Police Department to abandon its efforts to arrest and prosecute drug peddlers, they would have had the right to advocate that. They didn't, however. Instead they joined up.

Now, my advice to a policeman or any other public servant who says it's just not worth it, it's too hard, we can't do it, is to quit, quit and move over and let somebody else take over, somebody who doesn't have that [140] attitude. Or if you don't want to quit, ask for a transfer. Get yourself a desk job, or get yourself a job in some other area of the department. Or if you don't want to do that, then concentrate on other kinds of unlawful activity, as the defendants implied in this case that they did. Concentrate on burglars and rapists and robbers, and ignore the drug problem, if that's something you are comfortable with. But don't take money from the dope peddlers.

The fact that it's hard to put dope peddlers in jail may or may not in some twisted kind of way justify looking the other way, but it doesn't justify joining up, taking their money. It doesn't justify becoming part of the organization by giving them warnings when honest policemen are in the neighborhood.

Reference was made yesterday to a news article that occurred, I believe over the week[ ]end, about a cafeteria-style drug operation that was raided by some tactical officers in another district recently, and that was given as an illustration of the futility of the war on drugs. If you close it down one place, they open up someplace else.

[141] My impression from reading that article—and I could be wrong—but my impression is that that operation had not been going on for very long. In fact, I had the impression that it was fairly new. I certainly did not have the impression that it had been going on for two and three years, and that they were down on the street and obtaining the assistance of the local police in the conduct of the operation. Just the contrary was the impression I got from reading the news article, and that lifts my spirits, and I hope it lifts the spirits of the rest of this community, if indeed I am correct in my impression about the facts of that case.

The argument that it doesn't do any good is simply a self-serving rationalization for declaring yourself innocent. It is difficult to know whether we are making any headway in the effort to diminish the drug problem through law enforcement. It appears that we are not. However, that result is masked and skewed by the kind of conduct that occurred in this case. Do we

really know that maximum police effort is being made, and do we really know that the best kind of prosecutorial effort is being exerted against the problem?

I am not sure that members of my branch of the profession always hold up our end, however we might try, and the [k]ind of conduct on the part of the [142] police officers that we know occurred in this case is certainly an indication that there may not be a full-scale effort on the streets.

So before we throw in the towel on the drug problem, let's do the best we can with what we have, and see whether it works. We don't know yet, because the effort has been too ambiguous and difficult to measure.

Now, the other argument that has been made throughout the trial, and again yesterday, is that these defendants didn't really get very much. The amount of money and merchandise that they received really was small.

Well, it was small compared to what C.W. Wilson and these other people earned. No one suggests that the Marquette 10 defendants became millionaires as a result of this matter. But I do not regard that as a mitigating circumstance. It's a further dimension of the tragedy. These defendants were willing to sell their honor very cheaply, and if this is cause for jubilation on the part of anyone, I would like to know why.

I am not saying that I would regard them more favorably had they received more money, but I cannot say that I regard them as being less guilty because they were willing to work for low pay. And in many instances, it wasn't all that low. My impression is that some of these people were earning through the payoffs that were [143] evidenced in this case an amount of money that was approximately equal to their salaries from the police department. And of course, that money had the wonderful characteristic of being untaxed. Most of us take home a portion of what we earn. The government gets the rest. Bribe money is a hundred cents on the dollar.

But in any event, the amount of money that the defendants received was substantial, and if it was less than they might have liked to receive, that's their problem. It's not ours.

What about the length of the sentence? What kind of length are we talking about that will serve as an example, that might do some good?

One thing you have to understand is that the time served is not the same as the sentence imposed. One of the defense counsel indicated yesterday that a ten-year sentence results in a time actually served, even without parole, of about seven years. In fact, a ten-year sentence results in time served of six years and eight months. This is because of the good time that a prisoner earns simply by keeping out of trouble in the institution.

A 15-year sentence results in good time of 1,800 days, so that the time actually served on a 15-year sentence is precisely 10 years, assuming that the prisoner does not get into difficulty in the institution. [144] On a 20-year sentence the maximum good time is 2,400 days, so that the time actually served on the 20-year sentence is 13 years and 4 months.

Most of the offenses for which these defendants have been convicted are sentences for which they could be paroled at the expiration of one-third of their time. Whether these defendants would be paroled is, of course, something that I have nothing to do with. But in assessing the length of sentence that is appropriate to serve as a deterrent, one does not simply look at gross numbers. One has to look at the way things work in the real world, in institutions that are so crowded that very often people are released simply to make room for others who have been sentenced more recently.

I do not mean to imply that in the sentences I am going to impose today I am going to try to predict what is going to happen, either on good time or on parole. I

am not. That would be unfair to these defendants. I don't pretend to have a crystal ball. But it would be unfair to the public for me not to be cognizant as well that these defendants, with their previous good records, are entirely likely to earn every minute of good time that is available to them by statute.

Now I would like to talk about the individual defendants. I agree with the government's [145] characterization of the relative fault of the various defendants. They seem to me to fall into two groups, as the government suggests, and I believe that the less culpable group is Lowery, Ballauer, Desimone and Eatman.

Lowery is in a separate category altogether, in my view. I believe that he alone of all the defendants would not have done this on his own. If Lowery had been left alone, he would have been the same kind of exemplary police officer that he was in the military, that he has been in every other thing he has ever done in his life. Lowery fell victim to the code of silence, to the pressure of his fellow officers, and his case is, in my view, the most tragic of all.

I believe that his motivation was not greed. There were instances here where he gave back the money. He said he didn't want it. I believe there was one instance where he said it was too much.

And if there is anything excusable in any of the conduct that occurred here, it might be the conduct of Lowery which occurred as much as anything else for the reason that he had misguided loyalty.

One is put in mind of the statement by the great English statesman Edmund Burke: "All that is necessary for evil to triumph is for good men to do nothing."

Curtis Lowery is a good man. He didn't [146] do nothing. He tried to do something. But he didn't try hard enough or long enough. He didn't do enough. And as a result, he has become ensnared in something that was not of his making, but which he should have known enough to get out of, and could have gotten out of if he had used the kind of judgment of which he is capable and exhibited the courage which he already has.

[147] Eatman and Desimone, on the other hand, got involved on their own volition, not through pressure by anybody. This operation was so notorious that Desimone heard about it all the way up in Gang Crimes North, came down and dealt himself in. He smelled it, and he liked the smell. He liked the corruption that he smelled, and he went down there and got involved with both hands as did Eatman. Eatman placed himself on the hood of a car and said, "I am staying here until I get mine."

The only sense in which Desimone and Eatman are less culpable than the other defendants is that they were involved for a lesser period of time and on a less frequent basis than the other defendants. And, generally speaking, we see less money than [with] the other defendants.

This case is getting pretty old. It is one that has not improved with age. I am sure that is true with everyone connected with it. The probation officers, several of them, remarked that in their entire experience, their work on this case has been the most distasteful that they have ever had to perform. Yet, in each instance, the probation officers have recommended that very substantial terms of imprisonment be imposed. That time that we have all dreaded for so long has now come.

[148] Mr. Lowery, will you step forward, please.